**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN  DISTRICT OF TEXAS**
**HOUSTON  DIVISION**

| | | |
|---|---|---|
| **STEPHEN BARBEE,** § | | |
| § | | |
| **Plaintiff,** § | | |
| § | **No._____** |
| **vs.** § | | |
| **BRYAN COLLIER,** Executive Director, § | | |
| Texas Department of Criminal Justice § | | |
| Huntsville, Texas § | | |
| § | | |
| **BOBBY LUMPKIN,** Director, § | | |
| Texas Department of Criminal § | | |
| Justice, Correctional Institutions § | **(Death Penalty Case)** |
| Division, Huntsville, Texas § | | |
| § | | |
| **DENNIS CROWLEY,** Warden, Texas § | **Mr. Barbee is scheduled to be** |
| Department of Criminal Justice, § | **Executed on October 12, 2021** |
| Huntsville Unit, § | | |
| Huntsville, Texas, § | | |
| § | | |
| **Defendants.** § | | |
| § | | |

**COMPLAINT PURSUANT TO 42 U.S.C. § 1983**

**INTRODUCTION**

1. Plaintiff Stephen Barbee is a devout Christian and has been a life-long adherent to the

Pentecostal faith. He is incarcerated at the Polunsky Unit of the Texas Department of Criminal

Justice ("TDCJ") under a sentence of death in the custody of the defendants.

2. The State of Texas intends to execute Mr. Barbee on October 12, 2021, under

conditions that violate the First Amendment's Free Exercise Clause and substantially burden the

-1-

exercise of his religion in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq.

3. Relief is necessary to ensure that Mr. Barbee is executed only in a manner that does not substantially burden the exercise of his religious beliefs and does not violate his rights under the Free Exercise Clause or RLUIPA.

## JURISDICTION

4. This Court has jurisdiction under 42 U.S.C. §§ 2000cc-1, 28 U.S.C. §§ 1343, 1651, 2201, and 2202, and under 42 U.S.C.§ 1983.

## VENUE

5. Venue lies in this Court under 28 U.S.C. § 1391 because Defendants maintain offices in the Southern District of Texas. Venue is also proper because the execution will occur in this district.

## PARTIES

6. Plaintiff Stephen Barbee is incarcerated under a sentence of death at the Polunsky Unit of TDCJ in Livingston, Texas. He is scheduled to be executed on October 12, 2021.

7. Defendant Bryan Collier is the Executive Director of TDCJ. He is being sued in his official capacity.

8. Defendant Bobby Lumpkin is the Director of the Correctional Institutions Division of TDCJ. He is being sued in his official capacity. The state trial court has ordered Mr. Lumpkin to carry out Mr. Barbee's scheduled execution.

-2-

9. Defendant Dennis Crowley is the Senior Warden of the Huntsville Unit, where the State of Texas carries out executions. He is being sued in his official capacity. Because Mr. Crowley is the warden of the Huntsville Unit, he is responsible for supervising the scheduled execution in this case.

## PROCEDURAL HISTORY

10. Plaintiff Stephen Barbee was tried and convicted of capital murder in February 2006 for the deaths of Lisa and Jayden Underwood in Tarrant County, Texas. The Texas Court of Criminal Appeals ("CCA") affirmed the conviction and sentence on appeal in *Barbee v. State*, No. AP-75,359 (Tex. Crim. App. December 10, 2008) (not designated for publication). The CCA denied relief in Mr. Barbee's initial state habeas proceeding. *Ex parte Barbee*, No. WR-71,070-01 (Tex. Crim. App. January 14, 2009) (per curiam) (not designated for publication).

11. On October 4, 2010, Mr. Barbee filed an initial federal habeas petition in the Northern District of Texas challenging his state court conviction and sentence. On October 2, 2013, he filed an amended federal habeas petition. On July 7, 2015, the federal district court entered a final memorandum and order denying all claims and also denying a certificate of appealability. *Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. Sept. 1, 2015).

12. Mr. Barbee appealed to the Fifth Circuit and on November 23, 2016, the United States Court of Appeals for the Fifth Circuit granted a certificate of appealability on the issue of whether he was deprived of his Sixth Amendment rights because trial counsel rendered ineffective assistance of counsel by conceding Barbee's guilt at the guilt phase of trial during closing argument. *Barbee v. Davis*, 660 F. App'x. 293 (5th Cir. 2016).

-3-

13. On March 21, 2018, the Fifth Circuit issued an opinion denying relief. *Barbee v. Davis*, 728 Fed.Appx. 259 (5th Cir., March 21, 2018), and on November 19, 2018, the Supreme Court denied certiorari. *Barbee v. Davis*, 139 S. Ct. 566 (2018).

14. On May 9, 2019, the trial court set an execution date of October 2, 2019 for Mr. Barbee. Mr. Barbee then filed a subsequent state habeas application in the CCA raising a claim under *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), that his trial counsel's unauthorized concession of guilt to the jury violated his Sixth Amendment autonomy right to maintain his innocence at trial. The CCA stayed Mr. Barbee's execution, *Ex parte Barbee*, 2019 WL 4621237 (Tex. Crim. App. Sept. 23, 2019), and requested further briefing on the *McCoy* issue.

15. On February 10, 2021, the CCA issued an opinion denying Mr. Barbee's application, *Ex Parte Barbee*, 616 S.W.3d 836 (Tex. Crim. App. 2021). On March 30, 2021, the State submitted a motion to set an execution date for Mr. Barbee and on July 6, 2021, the trial court signed an "Order Setting Execution Date" of October 12, 2021 for Mr. Barbee.

16. On July 10, 2021, Mr. Barbee timely filed a petition for writ of certiorari in the United States Supreme Court. *Barbee v. Texas*, No. 21-5093. The State filed their Brief in Opposition on August 4, 2021 and Barbee filed his reply brief on August 18, 2021. On August 19, 2021, the Supreme Court announced that the matter will be conferenced on September 27, 2021.

## FACTUAL BACKGROUND

17. Until April 2019, TDCJ allowed TDCJ-approved chaplains in the execution chamber to guide persons being executed into the afterlife according to their religious beliefs. Between 1982 and March 2019, Texas conducted 560 executions pursuant to this policy.

18. In March 2019, TDCJ refused inmate Patrick Murphy's request that his Buddhist spiritual advisor accompany him in the chamber during the scheduled execution. *See Murphy v. Collier*, 139 S. Ct. 1475 (2019). Patrick Murphy had sought access for his Buddhist priest in the chamber so that the priest could "chant[] while a lethal injection is administered" to assist him in "remaining focused on Buddha while dying." *Murphy*, 139 S. Ct. at 1484 (Alito, J., dissenting). After TDCJ refused Murphy's request, he filed a request for a stay of execution in the Supreme Court and sought to challenge TDCJ's decision on equal protection and First Amendment grounds. *See id*.

19. On March 28, 2018, the Supreme Court granted a stay of execution and issued an order prohibiting TDCJ from carrying out the execution "pending the timely filing and disposition of a petition for a writ of certiorari unless the State permits Murphy's Buddhist spiritual advisor or another Buddhist reverend of the State's choosing to accompany Murphy in the execution chamber during the execution." *Murphy*, 139 S. Ct. at 1475. Justice Kavanaugh wrote a concurring opinion, in which he expressed his view that "the Constitution prohibits [the] denominational discrimination" of the then-existing TDCJ policy. *Id*. at 1475-76. Justice Kavanaugh observed that a potential remedy for this denominational discrimination would be to ban *all* spiritual advisors of *any* denomination from the chamber. *Id*.

20. On April 2, 2019, TDCJ revised its Execution Procedure to provide that "TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the

-5-

execution only from the witness rooms. Ex. A, Tex. Dep't Crim. Just., Execution Procedure at 8 (Apr. 2019).

21. Following the setting of his execution for June 16, 2020, Ruben Gutierrez, a condemned inmate, brought a § 1983 complaint under the First Amendment and the RLUIPA, challenging TDCJ's prohibition on the presence of any spiritual advisor in the chamber and noting that "communal prayer [is] a longstanding religious tradition worthy of First Amendment protection" and that "Texas has long recognized that a condemned prisoner's prayer with a chaplain is integral in executions." Pet. For Writ of Certiorari at 24, *Gutierrez v. Saenz*, No. 19-8594 (S. Ct.), cert. granted, 141 S. Ct. 1260 (2021). A panel of the Fifth Circuit Court of Appeals had vacated the district court's grant of a stay of execution based on the challenge to TDCJ's spiritual advisor policy, but the United States Supreme Court granted a stay. The Supreme Court remanded the case to the district court to make factual findings regarding "whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez*, 141 S. Ct. at 127. After the district court made findings that no security problem would result, the Supreme Court granted certiorari, vacated the Fifth Circuit's panel decision, and remanded the case for consideration on the merits. *Gutierrez*, 141 S. Ct. 1260, 1261 (2021).

22. On April 21, 2021, TDCJ again revised its Execution Procedure, presumably in response to the litigation in *Gutierrez v. Saenz*. This time, the protocol provided that the condemned may be accompanied in the execution chamber by their personal religious advisor, who may minister to the condemned during the execution. Under the new policy, TDCJ requires that the spiritual advisors be verified and pass a background check. Ex. B., Tex. Dep't. Crim. Just., Execution Procedure at 8 (Apr. 2021).

23. On August 10, 2021, John Henry Ramirez brought a complaint under 42 U.S.C. § 1983 alleging that TDCJ had informed Mr. Ramirez and his counsel that TDCJ policy forbid Mr. Ramirez's spiritual advisor  from laying hands upon him at the time of his death, "a long-held and practiced tradition in Christianity in general and in the Protestant belief system Mr. Ramirez adheres to." Mr. Ramirez's complaint alleged that TDCJ's "No Contact" policy violated his rights under the Free Exercise Clause of the First Amendment and RLUIPA, 42 U.S.C. § 2000cc *et seq.  Ramirez v. Collier et. al.*, No 4:21-CV-02609, ECF No. 1.

24. In his complaint, Mr. Ramirez alleged that his spiritual advisor "needs to lay his hands on Mr. Ramirez" at the time of his death "in accordance with [the spiritual advisor's] and Mr. Ramirez's faith tradition." *Id.* at 5, ¶17. Mr. Ramirez further alleged that "the laying on of hands is a symbolic act in which religious leaders place their hands on a person in order to confer a spiritual blessing." *Id.* at ¶18.

25. Mr. Ramirez attached as an exhibit to his Amended Complaint an Offender Form I-127 complaining that the Director of Chaplaincy at TDCJ had told him that his spiritual advisor was not going to be allowed to have physical contact with him in the execution chamber.  In response, on July 2, 2021, a representative of the TDCJ typed, "A spiritual advisor is not allowed to touch an inmate while in the execution chamber." *Ramirez*, No. 4:21-cv-022609, ECF No. 5 at 38-39.

26. On August 22, 2021, Mr. Ramirez filed a second amended complaint in which he alleged that, in addition to being prohibited from touching Mr. Ramirez during the execution to administer a final blessing, the spiritual advisor would be prohibited from praying aloud while in the chamber. Mr. Ramirez attached as an exhibit to his second amended complaint a letter dated August 19, 2021, from TDCJ's general counsel to Ramirez's counsel, in which TDCJ's counsel

informed Ramirez's counsel that, "At this time, TDCJ does not allow the spiritual advisor to pray out loud once inside the execution chamber." Ex. C, Letter from General Counsel Worman to Eric Allen, counsel for Ramirez, dated August 19, 2021. The August 19 letter also reiterated that the spiritual advisor would *not* be allowed physical contact with Mr. Ramirez once inside the execution chamber. *Ibid*.

27. On September 7, 2021 Mr. Ramirez sought a stay of execution from the United States District Court for the Southern District of Texas, based on the likelihood that he would prevail on his § 1983 challenge to TDCJ's "No Speaking" and "No Contact" policies. When the district court denied his motion for a stay of execution, Mr. Ramirez appealed to the United States Court of Appeals for the Fifth Circuit, and when the Fifth Circuit affirmed the district court's denial of a stay, Mr. Ramirez filed a motion for a stay of execution in the United States Supreme Court, along with a petition for writ of certiorari. *Ramirez v. Collier, et. al.*, No. 21-5592; 21A33.

28. On September 8, 2021, the United States Supreme Court stayed Mr. Ramirez's execution and granted a writ of certiorari to answer the questions presented in Mr. Ramirez's petition about TDCJ's "No Contact" and "No Speaking" policies forbidding spiritual advisors who are present in the execution chamber from vocal prayer and from having physical contact with condemned persons as they are about to be executed. *Ramirez v. Collier, et. al*, No. 21-5592. The case will be argued on November 1, 2021.

29. Mr. Barbee is a devout Christian and has been throughout his life. He has been active in the Pentecostal church since childhood, including teaching Sunday School classes. Mr. Barbee's pastors were Calvin and Nancy Cearley. Calvin Cearley is now deceased, and Nancy Cearley, who is over 90 years old and unable to travel, continues to stay in touch with Mr. Barbee. *See* Ex. D, Declaration of Tina Church. The laying on of hands—a symbolic act in

which religious leaders place their hands on a person in order to confer a spiritual blessing—is part of Mr. Barbee's Pentecostal faith. [*Id*.]

30. Jennifer Cherry, Mr. Barbee's niece, has also attested to Mr. Barbee's long-standing faith and the particular beliefs of his Pentecostal faith. *See* Ex. H, Declaration of Jennifer Cherry. At one point, Mr. Barbee and his wife were church group leaders. His faith places great importance on praying out loud and the laying on of hands.  "If this is not allowed him, if and when he goes on to be with the Lord, it would be detrimental to his mental health, peace of mind and belief system at the time of his passing." *Id.*

31. Stephen Barbee was anticipating that Nancy Cearley would be present as his spiritual advisor and has expressed that it is important for him to have an advisor there with him "to pray with me at the time of my death in the chamber, if or when I reach such time. It's the words of a minister that matters, especially when it's written in the Bible that two or more should pray together. And with that Faith, I believe." *See* Ex. E, Declaration of Stephen Barbee, August 20, 2012.

32.  Accordingly, Mr. Barbee designated Nancy Cearley as his spiritual advisor.  Mr. Barbee did so under the assumption that, in accordance with TDCJ's policy, as amended in April 2021, Mr. Brown would be allowed to be physically present in the chamber, to audibly pray and to physically touch Mr. Barbee in order to confer ministrations and a spiritual blessing upon him at the time of his death. However, shortly after Ms. Cearley was designated, Mr. Barbee learned from the Polunsky Unit chaplain "that she was not able to attend as she is over 90 years old and has health problems." *See* Ex. F, Declaration of Adrián de la Rosa, September 16, 2021. When Ms. Cearley later confirmed that she could not attend, Mr. Barbee designated Mr. Barry Brown of the Salvation Army, as his advisor in her place. *Id.*

33.  On September 15, 2021, undersigned counsel e-mailed an inquiry to TDCJ General Counsel Ms. Kristen Worman to inquire whether the current policies forbade Mr. Barbee's designated spiritual advisor, Mr. Brown, from being able to pray aloud and touch him in the execution chamber and whether the restrictions imposed on Mr. Ramirez's spiritual advisor were still in effect.  *See* Ex. I, e-mailed letter from A. Richard Ellis to Kristen Worman, Sept. 15, 2021. On September 16, 2021, Ms. Amy Lee, Project Coordinator of the Office of General Counsel-TDCJ replied that any such "concerns or complaints related to health-related matters or other confinement issues within the TDCJ's control are addressed by following the process as outlined in the Grievance Procedures for Offenders section of the TDCJ Offender Orientation Handbook." Ex. I, e-mail reply of Amy Lee, September 16, 2021.  Thus, the questions posed by Mr. Barbee remained unanswered.

34. On September 7, 2021, Mr. Barry Brown informed Mr. Barbee that "TDCJ would not allow him [Mr. Brown] to touch me or speak to me while I was in the death chamber, during my execution." *See* Ex. G, Step 1 Grievance Offender Form submitted by Stephen Barbee on September 15, 2021.  Mr. Barbee complained that "I am being deprived of my religious rights because I believe my spiritual advisor should touch me and say the appropriate words while I'm in the death chamber." *Id.*

35.  On September 16, 2021, this grievance was denied: "At this time the spiritual advisor is not allowed to touch the inmate or speak out loud once inside the execution chamber. No further action is warranted at this time." *Id.* at 2.

36. Upon information and belief, Mr. Barbee has submitted a Stage 2 grievance in order to exhaust his administrative remedies.  Documentation will be forthcoming as soon as it is received.

-10-

## CLAIMS FOR RELIEF

**1. TDCJ's POLICY PROHIBITING APPROVED SPIRITUAL ADVISORS FROM VOCAL PRAYER AND PHYSICAL CONTACT WITH CONDEMNED INMATES WHILE PROVIDING SPIRITUAL GUIDANCE AND COMFORT OF CLERGY IN THE EXECUTION CHAMBER VIOLATES THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT ("RLUIPA").**

37. Mr. Barbee re-alleges and incorporates by reference the allegations contained in the previous paragraphs of this Complaint.

38. As laid out above, TDCJs amended policy prohibiting approved spiritual advisors from speaking aloud and having physical contact while providing spiritual guidance and comfort of clergy to condemned inmates in the execution chamber violates Mr. Barbee's First Amendment rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

39. Congress enacted RLUIPA "to provide very broad protection for religious liberty"--- even greater protection than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 356-57 (2015). RLUIPA provides that the government shall not "impose a substantial burden" on an inmates "religious exercise," unless the government shows that imposing such a burden can withstand strict scrutiny, meaning the policy  "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1 (a).

40. Under RLUIPA, "religious exercise" is defined broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 u.S.C. § 2000cc-5(7)(A). A government or state entity may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution even if the burden results

from a rule of general applicability," unless the government demonstrates that imposition of the burden is both in furtherance of a compelling governmental interest and is also the least restrictive means of furthering that interest. 42 U.S. C. § 2000cc-1 (2000).

41. Both the "No Speaking" and "No Contact" policies that TDCJ has adopted constitute a substantial burden on Mr. Barbee's religious exercise and cannot pass muster under RLUIPA. TDCJ cannot demonstrate that this burden is in furtherance of a compelling government interest, nor that banning spiritual advisors from speaking aloud and physically touching the person who is going to be executed is the least restrictive means of furthering any asserted interest.

**2. TDCJ's POLICY PROHIBITING APPROVED SPIRITUAL ADVISORS FROM VOCAL PRAYER AND HAVING PHYSICAL CONTACT WITH CONDEMNED PERSONS WHILE PROVIDING SPIRITUAL GUIDANCE AND COMFORT OF CLERGY IN THE EXECUTION CHAMBER VIOLATES THE FREE EXERCISE CLAUSE BECAUSE IT INHIBITS THE FREE EXERCISE OF MR. BARBEE'S CHRISTIAN FAITH.**

42. Mr. Barbee re-alleges and incorporates by reference the allegations contained in the previous paragraphs of this complaint.

43. The First Amendment commands that "Congress shall make no law. . . . prohibiting the free exercise of" religion. U.S.Const. amend. I. The Free Exercise Clause applies to state government actions. *See Cantwell v. Connecticut*, 319 U.S. 296, 303 (1940) (holding that the protections of the Free Exercise Clause are incorporated by the Fourteenth Amendment against the States).

44. Application of TDCJ's policy prohibiting spiritual advisors and chaplains from vocalizing prayer and having physical contact with the condemned while in the execution chamber will inhibit the exercise of Mr. Barbee's Christian faith and will prevent the

performance of essential religious customs in the critical moments as Mr. Barbee transitions into the afterlife. When considering laws or policies that inhibit the free exercise of religion, reviewing courts must first determine whether the law is neutral and generally applicable. *Church of the Lukumi Babulu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). A law or policy that is not both neutral and of general applicability "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id*.

45. TDCJ's policy is not neutral because it evinces a hostility toward religion by denying religious exercise at the precise moment it is needed most: when someone is transitioning from this life to the next. The policy does this on its face and clearly targets those prisoners who believe they need a spiritual advisor with them in the execution chamber. The TDCJs policy thus is permissible only if it can survive strict scrutiny, which it cannot.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows:

1. A declaratory judgment that TDCJ's "No Speaking" and "No Contact" policies violate Mr. Barbee's rights under the First Amendment's Free Exercise Clause.

2. A declaratory judgment that TDCJ's "No Speaking" and "No Contact" policies violate RLUIPA.

3. A preliminary and permanent injunction prohibiting Defendants from executing Mr. Barbee until they allow his spiritual advisor not only to be present with him in the chamber, but to pray audibly with him and have physical contact with him in order to confer a blessing upon him.

DATED: September 21, 2021.

-13-

Respectfully submitted,

*s/s A. Richard Ellis*

_____
A.  Richard Ellis
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
a.r.ellis@att.net

**CERTIFICATE OF ELECTRONIC SERVICE**

I, A. Richard Ellis, do hereby certify that I electronically filed the foregoing pleading with the Clerk of the Court for the United States District Court for the Southern District of Texas, using the electronic case filing system of the Court on September 21, 2021.  I have also served Defendant's counsel of record, Mr. Stephen Hoffman of the Office of the Attorney General, State of Texas  via e-mail at stephen.hoffman@oag.texas.gov.

_/s/ A. Richard Ellis_
A.  RICHARD ELLIS
Attorney for Plaintiff Stephen Barbee
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
a.r.ellis@att.net

# EXHIBIT A

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Correctional Institutions Division



# EXECUTION PROCEDURE

## April 2019

## *ADOPTION OF EXECUTION PROCEDURE*

In my duties as Division Director of the Correctional Institutions Division, I hereby adopt the attached Execution Procedure for use in the operation of the Texas Department of Criminal Justice Death Row housing units and perimeter functions. This Procedure is in compliance with Texas Board of Criminal Justice Rule §152.51; §§492.013(a), 493.004, Texas Government Code, and Article 43.14 – 43.20, Code of Criminal Procedure.


Lorie Davis
Director, Correctional Institutions Division

4·2·19
Date

# EXECUTION PROCEDURES

## PROCEDURES

**I. Procedures Upon Notification of Execution Date**

    A. The clerk of the trial court pursuant to Tex Code of Criminal Procedure art. 43.15 shall officially notify the Correctional Institutions Division (CID) Director, who shall then notify the Death Row Unit Warden, and the Huntsville Unit Warden of an offender's execution date. Once an execution date is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief, and the Death Row Supervisor.

    B. The Death Row Supervisor shall schedule an interview with the condemned offender and provide him with the Notification of Execution Date (Form 1). This form provides the offender with a list of the information that shall be requested from him (2) two weeks prior to the scheduled execution.

    C. The condemned offender may be moved to a designated cell. Any keep-on-person (KOP) medication shall be confiscated and administered to the offender as needed by Unit Health Services staff.

**II. Stays of Execution**

    A. Official notification of a stay of execution shall be delivered to the CID Director, the Death Row Unit Warden, and the Huntsville Unit Warden through the Huntsville Unit Warden's Office. **Staff must not accept a stay of execution from the offender's attorney.** After the official stay is received, the Death Row Unit Warden's office shall notify the Unit Classification Chief and Death Row Supervisor.

    B. Designated staff on the Death Row Unit shall notify the offender that a stay of execution has been received.

**III. Preparation of the Execution Summary and Packet**

    A. Two Weeks (14 days) Prior to the Execution

        1. The Death Row Unit shall begin preparation of the Execution Summary. The Execution Summary (Form 2) and the Religious Orientation Statement (Form 3) shall be forwarded to the Death Row Supervisor or Warden's designee for completion. A copy of the offender's current visitation list and recent commissary activity shall also be provided.

        2. The Death Row Supervisor shall arrange an interview with the condemned offender to gather the information necessary to complete the Execution Summary and Religious Orientation Statement.

Case 4:21-cv-03077   Document 11-1   Filed on 08/31/20 in TXSD   Page 24 of 66

3.  An offender may request to have his body donated to the Texas State Anatomical Board for medical education and research. The appropriate paperwork shall be supplied to the offender upon request.

4.  The Execution Summary must be completed and returned by the Death Row Supervisor or Warden's designee in sufficient time to be forwarded to the CID Director's Office by noon of the 14th day. After approval by the CID Director, the summary shall be forwarded to the Death Row Unit Chaplain, the Huntsville Unit Warden's Office, and the Communications Department.

5.  If the offender wishes to change the names of his witnesses, and it is less than fourteen (14) days prior to the scheduled execution, the offender shall submit a request in writing to the CID Director through the Death Row Unit Warden, who shall approve or disapprove the changes.

6.  The Death Row Unit is responsible for completion of the Execution Packet which shall include:
    a.  Execution Summary;
    b.  Religious Orientation Statement;
    c.  Copy of the Offender Travel Card;
    d.  Current Visitation List;
    e.  Execution Watch Notification;
    f.  Execution Watch Logs;
    g.  I-25 Offender's Request for Trust Fund Withdrawal;
    h.  Offender Property Documentation (PROP-05 and PROP-08); and
    i.  Other documents as necessary.

7.  The Death Row Supervisor or the Warden's designee shall notify staff (Form 4) to begin the Execution Watch Log (Form 5).

8.  The Execution Watch Log shall begin at 6:00 a.m. seven (7) days prior to the scheduled execution. The seven (7) day timeframe shall not include the day of the execution. The offender shall be observed, logging his activities every 30 minutes for the first six (6) days and every 15 minutes for the remaining 36 hours. The Communications Department may request information from the Execution Watch Log on the day of execution.

9.  The original Execution Packet and the offender's medical file shall be sent with the condemned offender in the transport vehicle to the Huntsville Unit or the Goree Unit for a female offender. The Death Row Unit Warden shall maintain a copy of the Execution Packet on the Death Row Unit.

10. If there are any changes necessary to the Execution Packet, staff shall notify the CID Director's Office and the Huntsville Unit Warden's Office.

B. The Day of Execution

1. On the morning of the day of the execution prior to final visitation, all of the offender's personal property shall be packed and inventoried. The property officer shall complete an "Offender Property Inventory" (PROP-05) detailing each item of the offender's property. The property officer shall also complete a "Disposition of Confiscated Offender Property" (PROP-08) indicating the offender's choice of disposition of personal property.

   a. If disposition is to be made from the Huntsville Unit a copy of the property forms should be maintained by the Death Row Unit Property Officer and the originals forwarded to the Huntsville Unit with the property.

   b. If disposition is to be made from the Death Row Unit a copy of the property forms will be placed in the Execution Packet and the original forms maintained on the Death Row Unit through the completion of the disposition process.

   c. The Mountain View Unit Warden shall ensure that a female offender brings personal hygiene and gender-specific items to the Huntsville Unit as appropriate.

2. Designated staff shall obtain the offender's current Trust Fund balance and prepare the Offender's Request for Trust Fund Withdrawal (I-25) for completion by the offender.

   a. The following statement should be written or typed on the reverse side of the I-25, "In the event of my execution, please distribute the balance of my Inmate Trust Fund account as directed by this Request for Withdrawal." The offender's name, number, signature, thumbprint, date, and time should be below this statement. Two (2) employees' names and signatures should be below the offender's signature as witnesses that the offender authorized the form.

   b. This Request for Withdrawal form shall be delivered to the Inmate Trust Fund for processing by 10:00 a.m. CST the next business day following the execution.

3. A female offender may be transported to the Goree unit prior to the day of the execution. The Execution Transport Log for Female Offenders (Form 7) shall be initiated at the Mountain View Unit. The Goree Unit staff will initiate the Execution Watch Log upon arrival on the Goree Unit, permit visitation as appropriate and transport the offender to the Huntsville Unit.

The Transport Log shall resume when the offender departs the Goree Unit.

4.  The condemned offender shall be permitted visits with family and friends on the morning of the day of the scheduled execution. No media visits shall be allowed at the Goree Unit.

    NOTE: Special visits (minister, relatives not on the visitation list, attorney, and other similar circumstances) shall be approved by the Death Row or Goree Unit Warden or designee. Exceptions may be made to schedule as many family members to visit prior to the offender's scheduled day of execution. These are considered to be special visits. No changes shall be made to the offender's visitation list.

5.  The Execution Watch Log shall be discontinued when the Execution Transport Log for Male Offenders (Form 6) is initiated.

6.  When appropriate the offender shall be escorted to 12 building at the Polunsky or the designated area at the Mountain View or Goree Unit and placed in a holding cell. The appropriate Execution Transport Log shall be initiated and the offender shall be prepared for transport to the Huntsville Unit. The offender shall be removed from the transport vehicle at the Huntsville Unit and escorted by Huntsville Unit security staff into the execution holding area.

7.  Any transportation arrangements for the condemned offender between units shall be known only to the Wardens involved, the CID Director, as well as those persons they designate as having a need to know. No public announcement shall be made concerning the exact time, method, or route of transfer. The CID Director's Office and the Communications Department shall be notified immediately after the offender arrives at the Huntsville Unit

8.  When the offender enters the execution holding area the Execution Watch Log shall immediately resume. The restraints shall be removed and the offender strip-searched.

9.  The offender shall be fingerprinted, placed in a holding cell, and issued a clean set of TDCJ clothing.

10. The Warden shall be notified after the offender has been secured in the holding cell. The Warden or designee shall interview the offender and review the information in the Execution Packet.

11. Staff from the Communications Department shall also visit with the offender to determine if he wishes to make a media statement and to obtain authorization, if necessary, to release the statement.

12. The offender may have visits with a TDCJ Chaplain(s), a Minister/Spiritual Advisor who has the appropriate credentials and his attorney(s) on the day of execution at the Huntsville Unit; however, the Huntsville Unit Warden must approve all visits.

13. There shall be no family or media visits allowed at the Huntsville Unit.

## IV. Drug Team Qualifications and Training

A. The drug team shall have at least one medically trained individual. Each medically trained individual shall at least be certified or licensed as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military corpsman. Each medically trained individual shall have one year of professional experience before participating as part of a drug team, shall retain current licensure, and shall fulfill continuing education requirements commensurate with licensure. Neither medically trained individuals nor any other members of the drug team shall be identified.

B. Each new member of the drug team shall receive training before participating in an execution without direct supervision. The training shall consist of following the drug team through at least two executions, receiving step-by-step instruction from existing team members. The new team member will then participate in at least two executions under the direct supervision of existing team members. Thereafter, the new team member may participate in executions without the direct supervision of existing team members.

C. The Huntsville Unit Warden shall review annually the training and current licensure, as appropriate, of each team member to ensure compliance with the required qualifications and training.

## V. Pre-execution Procedures

A. The Huntsville Unit Warden's Office shall serve as the communication command post and entry to this area shall be restricted.

B. Inventory and Equipment Check

1. Designated staff on the Huntsville Unit are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas.

2. The drug team shall obtain all of the equipment and supplies necessary to perform the lethal injection from the designated storage area.

3. An inventory and equipment check shall be conducted.

    4.   Expiration dates of all applicable items are to be checked on each individual item. Outdated items shall be replaced immediately.

C.   Minister/Spiritual Advisor and attorney visits shall occur between 3:00 and 4:00 p.m. CST unless exceptional circumstances exist. Exceptions may be granted under unusual circumstances as approved by the Huntsville Unit Warden.

D.   The offender shall be served his last meal at approximately 4:00 p.m. CST.

E.   The offender shall be afforded an opportunity to shower and shall be provided with clean clothes at some time prior to 6:00 p.m. CST.

F.   Only TDCJ security personnel shall be permitted in the execution chamber. The CID Director or designee and the Huntsville Unit Warden or designee shall accompany the offender while in the Execution Chamber. TDCJ Chaplains and Ministers/Spiritual Advisors designated by the offender may observe the execution only from the witness rooms.

## VI.   Set up Preparations for the Lethal Injection

A.   One (1) syringe of normal saline shall be prepared by members of the drug team.

B.   The lethal injection drug shall be mixed and syringes shall be prepared by members of the drug team as follows:

Pentobarbital - 100 milliliters of solution containing 5 grams of Pentobarbital.

C.   The drug team shall have available a back-up set of the normal saline syringe and the lethal injection drug in case unforeseen events make their use necessary.

## VII.   Execution Procedures

A.   After 6:00 p.m. CST and after confirming with the Office of the Attorney General and the Governor's Office that no further stays, if any, will be imposed and that imposition of the court's order should proceed, the CID Director or designee shall give the order to escort the offender into the execution chamber.

B.   The offender shall be escorted from the holding cell into the Execution Chamber and secured to the gurney.

C.   A medically trained individual shall insert intravenous (IV) catheters into a suitable vein of the condemned person. If a suitable vein cannot be discovered in an arm, the medically trained individual shall substitute a suitable vein in another part of the body, but shall not use a "cut-down" procedure to access a suitable vein. The medically trained individual shall take as much time as is needed to properly insert the IV lines. The medically trained individual shall connect an IV administration set, and start a normal saline solution to flow at a slow rate through

one of the lines.  The second line is started as a precaution and is used only if a potential problem is identified with the primary line.  The CID Director or designee, the Huntsville Unit Warden or designee, and the medically trained individual shall observe the IV to ensure that the rate of flow is uninterrupted.

D.  Witnesses to the execution shall be brought into the appropriate viewing area ONLY AFTER the Saline IV has been started and is running properly, as instructed by the Huntsville Unit Warden or designee.

E.  The CID Director or designee shall give the order to commence with the execution.

F.  The Huntsville Unit Warden or designee shall allow the condemned person to make a brief, last statement.

G.  The Huntsville Unit Warden or designee shall instruct the drug team to induce, by syringe, substances necessary to cause death.

H.  The flow of normal saline through the IV shall be discontinued.

I.  The lethal dose of Pentobarbital shall be commenced.  When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline.

J.  The CID Director or designee and the Huntsville Unit Warden or designee shall observe the appearance of the condemned individual during application of the Pentobarbital.  If, after a sufficient time for death to have occurred, the condemned individual exhibits visible signs of life, the CID Director or designee shall instruct the drug team to administer an additional 5 grams of Pentobarbital followed with a saline flush.

K.  At the completion of the process and after a sufficient time for death to have occurred, the Warden shall direct the physician to enter the Execution Chamber to examine the offender, pronounce the offender's death, and designate the official time of death.

L.  The body shall be immediately removed from the Execution Chamber and transported by a coordinating funeral home.  Arrangements for the body should be concluded prior to execution.

VIII.  Employee participants in the Execution Process shall not be identified or their names released to the public.  They shall receive an orientation with the Huntsville, Goree, Polansky, or Mountain View Unit Wardens, who shall inform the employees of the TDCJ ED-06.63, "Crisis Response Intervention Support Program" (CRISP).  The employees shall be encouraged to contact the Regional CRISP Team Leader following the initial participation in the execution process.

# EXHIBIT B

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Correctional Institutions Division



## EXECUTION PROCEDURE

### April 2021

## *ADOPTION OF EXECUTION PROCEDURE*

In my duties as Division Director of the Correctional Institutions Division, I hereby adopt the attached Execution Procedure for use in the operation of the Texas Department of Criminal Justice Death Row housing units and perimeter functions. This Procedure complies with Texas Board of Criminal Justice Rule §152.51; §§492.013(a), 493.004, Texas Government Code; and Articles 43.14 – 43.20, Texas Code of Criminal Procedure.

_____
Bobby Lumpkin
Director, Correctional Institutions Division

_____
4. 21. 2021
Date

# EXECUTION PROCEDURES

I.  **Notification of a Scheduled Execution Date**

    A.    Pursuant to Article 43.15, Texas Code of Criminal Procedure, the clerk of the trial court shall officially notify the Correctional Institutions Division (CID) Director, who shall then notify the Death Row Unit Warden and the Huntsville Unit Warden, of an inmate's scheduled execution date. Once a scheduled execution date is received, the Death Row Unit Warden's office shall notify the unit's Chief of Classification and the Death Row Supervisor.

    B.    The Death Row Supervisor shall schedule an interview with the inmate and provide the inmate with the Notification of Execution Date (Form 1). This form provides the inmate with a list of the information that shall be requested from the inmate two (2) weeks before the scheduled execution.

    C.    The inmate may be moved to a designated cell. Any keep-on-person (KOP) medication shall be confiscated and administered to the inmate as needed by medical staff on the unit.

    D.    Upon the inmate's receipt of the Notification of Execution Date (Form 1), the inmate shall have thirty (30) days to submit a request in writing to the Death Row Unit Warden to have a TDCJ Chaplain or the inmate's spiritual advisor present inside the execution chamber during the inmate's scheduled execution.

    E.    The inmate's requested spiritual advisor must be included on the inmate's visitation list and have previously established an ongoing spiritual relationship with the inmate demonstrated by regular communications or in-person visits with the inmate before the inmate's scheduled execution date.

    F.    If an inmate requests to have a spiritual advisor present inside the execution chamber during the inmate's scheduled execution, the inmate will provide the Death Row Unit Warden with contact information for the spiritual advisor. Upon receipt of the spiritual advisor's contact information, the Death Row Unit Warden shall contact the spiritual advisor.

        1.    The spiritual advisor shall have fourteen (14) days from the date of contact with the Death Row Unit Warden to provide credentials to the Death Row Unit Warden verifying the individual's official status as a spiritual advisor. As required in TDCJ Chaplaincy Manual Policy 11.09, "Inmate Ministerial and Spiritual Advisor Visits," the credentials shall be at least one of the following:

            a.    Minister Identification Card supplied by the authorizing denomination or religious group;

    b.     License or ordination certificate;

    c.     Official letter from an organized religious body or congregation indicating the status of the letter holder as an official representative of the religious body or congregation for all religious functions or for specific prison-related religious functions; or

    d.     A current listing as a clergy person in an official listing of ministers and clergy from an organized religious body.

2.    The TDCJ will perform a background check, including but not limited to a criminal background check, on the spiritual advisor.

3.    If the spiritual advisor is approved to be present inside the execution chamber during the inmate's scheduled execution, the spiritual advisor must satisfactorily complete a two (2) hour, in-person orientation with a staff member of the Rehabilitation Programs Division a minimum of ten (10) days before the inmate's scheduled execution date.

4.    If the spiritual advisor is determined to be a security risk, the Huntsville Unit Warden or designee may deny the inmate's request for the spiritual advisor to be present inside the execution chamber during the inmate's scheduled execution.

5.    The inmate or spiritual advisor may appeal the denial of the inmate's request to have the spiritual advisor present inside the execution chamber during the inmate's scheduled execution by submitting a request in writing to the CID Director. The decision of the CID Director is final.

## II.    Preparation of the Execution Summary and Packet

A.    Two Weeks (14 days) Before the Scheduled Execution

1.    The Death Row Unit is responsible for completion of the Execution Packet which shall include:

    a.   Execution Summary;
    b.   Religious Orientation Statement;
    c.   Current Visitation List;
    d.   Execution Watch Notification;
    e.   Execution Watch Log;
    f.   Inmate Request for Withdrawal (I-25);
    g.   Inmate Property Documentation (PROP-05 and PROP-08); and
    h.   Other documents as necessary.

2. The Execution Summary (Form 2) and the Religious Orientation Statement (Form 3) shall be forwarded to the Death Row Supervisor or the Death Row Unit Warden's designee for completion. A copy of the inmate's current visitation list and recent commissary activity shall also be provided.

3. The Death Row Supervisor shall arrange an interview with the inmate to gather the information necessary to complete the Execution Summary and Religious Orientation Statement.

4. The Execution Summary must be completed and returned by the Death Row Supervisor or the Death Row Unit Warden's designee in sufficient time to be forwarded to the CID Director's Office by noon of the fourteenth (14th) day. After approval by the CID Director, the Execution Summary shall be forwarded to the Death Row Unit Chaplain, the Huntsville Unit Warden's Office, and the Communications Department.

5. If the inmate wishes to change the names of the inmate's witnesses, and it is less than fourteen (14) days before the scheduled execution date, the inmate shall submit a request in writing to the CID Director, through the Death Row Unit Warden, who shall approve or disapprove the changes.

6. While completing the Religious Orientation Statement, staff shall confirm if the inmate still requests the presence of a TDCJ Chaplain or the inmate's approved spiritual advisor in the execution chamber during the inmate's scheduled execution.

7. An inmate may request to have the inmate's body donated to the Texas State Anatomical Board for medical education and research. The appropriate paperwork shall be supplied to the inmate upon request.

B. One Week (7 days) Before the Scheduled Execution

1. The Death Row Supervisor or the Death Row Unit Warden's designee shall notify staff (Form 4) to begin the Execution Watch Log (Form 5).

2. The Execution Watch Log shall begin at 6:00 a.m. Central Time seven (7) days before the inmate's scheduled execution. The seven (7) day timeframe shall not include the day of the inmate's scheduled execution. The inmate shall be observed, logging the inmate's activities every 30 minutes for the first six (6) days and every 15 minutes for the remaining 36 hours.

3. The Communications Department may request information from the Execution Watch Log on the day of the inmate's scheduled execution.

4.      The original Execution Packet and the inmate's medical file shall be sent with the inmate in the transport vehicle to the Huntsville Unit or the Goree Unit for a female inmate.

      a.  The Death Row Unit Warden shall maintain a copy of the Execution Packet on the Death Row Unit.

      b.  If there are any changes necessary to the Execution Packet, staff shall notify the CID Director's Office and the Huntsville Unit Warden's Office.

C.      The Day of the Scheduled Execution

1.      On the morning of the day of the scheduled execution, before final visitation, all the inmate's personal property shall be packed and inventoried. The property officer shall complete an "Inmate Property Inventory" (PROP-05) detailing each item of the inmate's property. The property officer shall also complete a "Disposition of Confiscated Inmate Property" (PROP-08) indicating the inmate's choice of disposition of personal property.

      a.  If disposition is to be made from the Huntsville Unit, a copy of the property forms shall be maintained by the Death Row Unit Property Officer, and the original property forms shall be forwarded to the Huntsville Unit with the inmate's property.

      b.  If disposition is to be made from the Death Row Unit, a copy of the property forms shall be placed in the Execution Packet, and the original forms shall be maintained on the Death Row Unit through the completion of the disposition process.

      c.  The Mountain View Unit Warden shall ensure that a female inmate brings personal hygiene and gender-specific items to the Huntsville Unit as appropriate.

2.      Designated staff shall obtain the inmate's current trust fund balance and prepare the Inmate Request for Withdrawal (I-25) for completion by the inmate.

      a.  The following statement shall be written or typed on the reverse side of the I-25 form, "In the event of my execution, please distribute the balance of my Inmate Trust Fund account as directed by this Request for Withdrawal." The inmate's name, number, signature, thumbprint, and the date and time of the inmate's signature shall be included below this statement. Two (2) employees' names and signatures shall be printed and signed below the inmate's signature

as witnesses that the inmate authorized the form.

    b.    The I-25 form shall be delivered to the Commissary and Trust Fund Department for processing by 10:00 a.m. Central Time the next business day following the completed execution.

3.    The inmate shall be permitted visitation with individuals designated on the inmate's approved visitation list on the morning of the day of the scheduled execution.

    a.    Exceptions may be made to schedule as many visits as possible before the inmate is transported to the Huntsville Unit. These visits are considered "Special Visits."

    b.    Special visits (spiritual advisor, attorney(s), and individuals not on the inmate's approved visitation list) shall be approved by the Death Row or Goree Unit Warden or designee. No changes shall be made to the inmate's approved visitation list.

    c.    No media visits shall be allowed at the Goree Unit.

4.    When appropriate, a male inmate shall be escorted to a holding cell at the Polunsky Unit. The Execution Transport Log for Male Inmates (Form 6) shall be initiated, and the inmate shall be prepared for transport to the Huntsville Unit. The Execution Watch Log shall be discontinued when the Execution Transport Log for Male Inmates is initiated.

5.    A female inmate may be transported to the Goree Unit before the day of the inmate's scheduled execution. The Execution Transport Log for Female Inmates (Form 7) shall be initiated at the Mountain View Unit. The Goree Unit staff will initiate the Execution Watch Log upon arrival at the Goree Unit, permit visitation as appropriate, and transport the female inmate to the Huntsville Unit. The Execution Watch Log shall be discontinued, and the Execution Transport Log for Female Inmates shall resume when the female inmate departs the Goree Unit.

6.    Any transportation arrangements for the inmate between units shall be known only to the Wardens involved, the CID Director, as well as those persons they designate as having a need to know. No public announcement shall be made concerning the exact time, method, or route of transfer.

7.    Upon arrival at the Huntsville Unit, the inmate shall be removed from the transport vehicle and escorted by Huntsville Unit security staff into the execution holding area. The CID Director's Office and the Communications Department shall be notified immediately after the inmate arrives at the Huntsville Unit.

8. The Execution Watch Log shall immediately resume when the inmate enters the pre-execution holding area.

9. The inmate's restraints shall be removed, and the inmate shall be fingerprinted and strip-searched.

10. The inmate shall be placed in a holding cell and issued a clean set of TDCJ clothing.

11. The Huntsville Unit Warden shall be notified after the inmate has been secured in the holding cell. The Huntsville Unit Warden or designee shall interview the inmate and review the information in the Execution Packet.

12. The inmate shall be permitted visitation with a TDCJ Chaplain(s), the inmate's approved spiritual advisor, and the inmate's attorney(s) on the day of the scheduled execution at the Huntsville Unit. The Huntsville Unit Warden must approve all visits.

13. There shall be no family or media visits allowed at the Huntsville Unit.

## III.    Drug Team Qualifications and Training

A. The drug team shall have at least one medically trained individual. Each medically trained individual shall at least be certified or licensed as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military corpsman. Each medically trained individual shall have one year of professional experience before participating as part of the drug team, shall retain current licensure, and shall fulfill continuing education requirements commensurate with licensure. Neither medically trained individuals nor any other members of the drug team shall be identified.

B. Each new member of the drug team shall receive training before participating in an execution without direct supervision. The training shall consist of following the drug team through at least two (2) executions, receiving step-by-step instruction from existing team members. The new team member will then participate in at least two (2) executions under the direct supervision of existing team members. Thereafter, the new team member may participate in executions without the direct supervision of existing team members.

C. The Huntsville Unit Warden shall review annually the training and current licensure, as appropriate, of each drug team member to ensure compliance with the required qualifications and training.

IV.     **Pre-execution Procedures**

    A.     The Huntsville Unit Warden's Office shall serve as the communication command post, and entry to the office area shall be restricted.

    B.     Inventory and Equipment Check

        1.     Designated Huntsville Unit staff are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas.

        2.     The drug team shall obtain all equipment and supplies necessary to perform the lethal injection from the designated storage area.

        3.     An inventory and equipment check shall be conducted.

        4.     Expiration or beyond use dates of all applicable items are to be checked on each individual item. Outdated items shall be replaced immediately.

    C.     Attorney visits shall occur between 3:00 and 4:00 p.m. Central Time, and spiritual advisor visits shall occur between 3:00 and 5:00 p.m. Central Time. The attorney and spiritual advisor may not meet with the inmate at the same time. Exceptions may be granted under unusual circumstances and must be approved by the Huntsville Unit Warden.

        1.     The inmate's attorney or the inmate's approved spiritual advisor must arrive at the Huntsville Unit no later than 2:30 p.m. Central Time on the day of the scheduled execution to participate in an attorney or spiritual advisor visit with the inmate.

        2.     The inmate's approved spiritual advisor must arrive at the Huntsville Unit no later than 5:00 p.m. Central Time on the day of the scheduled execution to accompany the inmate in the execution chamber.

        3.     The failure of an inmate's approved spiritual advisor to arrive at the Huntsville Unit before 5:00 p.m. Central Time on the day of the scheduled execution will not prevent the execution from proceeding.

    D.     The inmate shall be served a last meal at approximately 5:00 p.m. Central Time.

    E.     The inmate shall be afforded an opportunity to shower and shall be issued a clean set of TDCJ clothing at some time before 6:00 p.m. Central Time.

V.      **Preparations for the Lethal Injection**

    A.     One (1) syringe of normal saline shall be prepared by members of the drug team.

B.     The lethal injection drug shall be mixed and syringes shall be prepared by members of the drug team as follows:

Pentobarbital - 100 milliliters of solution containing 5 grams of Pentobarbital.

C.     The drug team shall have available a back-up set of the normal saline syringe and the lethal injection drug in case unforeseen events make their use necessary.

VI.    **Execution Procedures**

A.     After 6:00 p.m. Central Time and after confirming with the Office of the Attorney General and the Governor's Office that no further stays of execution, if any, will be imposed and that imposition of the court's order should proceed, the CID Director or designee shall give the order to escort the inmate into the execution chamber.

B.     The inmate shall be escorted from the holding cell into the execution chamber and secured to the gurney.

C.     A medically trained individual shall insert intravenous (IV) catheters into a suitable vein of the inmate. If a suitable vein cannot be discovered in an arm, the medically trained individual shall substitute a suitable vein in another part of the body but shall not use a "cut-down" procedure to access a suitable vein. The medically trained individual shall take as much time as is needed to properly insert the IV lines. The medically trained individual shall connect an IV administration set and start a normal saline solution to flow at a slow rate through one of the lines. The second line is started as a precaution and is used only if a potential problem is identified with the primary line. The CID Director or designee, the Huntsville Unit Warden or designee, and the medically trained individual shall observe the IV lines to ensure that the rate of flow is uninterrupted.

D.     After the normal saline solution IV has been started and is running properly, the following shall occur as instructed by the Huntsville Unit Warden or designee:

1.     If requested by the inmate and previously approved by the TDCJ, a TDCJ Chaplain or the inmate's approved spiritual advisor will be escorted into the execution chamber by an agency representative to observe the inmate's execution.

2.     Witnesses to the execution shall be escorted into the appropriate witness rooms.

NOTE: Any behavior by the spiritual advisor or witnesses deemed by the CID Director or designee to be disruptive to the execution procedure shall be cause for immediate removal from the Huntsville Unit.

E.    The CID Director or designee shall give the order to commence with the execution.

F.    The Huntsville Unit Warden or designee shall allow the inmate to make a brief, last statement.

G.    The Huntsville Unit Warden or designee shall instruct the drug team to induce, by syringe, substances necessary to cause death.

H.    The flow of normal saline solution through the IV shall be discontinued, and the lethal dose of Pentobarbital shall be commenced.

I.     When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline solution.

J.     The CID Director or designee and the Huntsville Unit Warden or designee shall observe the appearance of the inmate during application of the Pentobarbital. If, after a sufficient time for death to have occurred, the inmate exhibits visible signs of life, the CID Director or designee shall instruct the drug team to administer an additional 5 grams of Pentobarbital followed with a normal saline solution flush.

K.    At the completion of the process and after a sufficient time for death to have occurred, the Huntsville Unit Warden or designee shall direct the physician to enter the execution chamber to examine the inmate, pronounce the inmate death, and designate the official time of death. After the inmate is pronounced deceased, the spiritual advisor will be escorted from the execution chamber, and the witnesses shall be escorted from the witness rooms.

L.    The inmate's body shall be immediately removed from the execution chamber and transported by a coordinating funeral home. Arrangements for the inmate's body shall be concluded before the execution.

## VII.   Stays of Execution

A.    Official notification of a stay of execution shall be delivered to the CID Director, the Death Row Unit Warden, and the Huntsville Unit Warden. **Staff must not accept a stay of execution from the inmate's attorney.** After the official stay of execution is received, the Death Row Unit Warden's office shall notify the unit's Chief of Classification and Death Row Supervisor.

B.    Designated staff on the Death Row Unit shall notify the inmate that a stay of execution has been received.

**VIII.**      **Confidentiality of Participants**

A.      Participants in the execution process shall not be identified, nor shall their names be released to the public.

B.      Before participating in a scheduled execution, the inmate's approved spiritual advisor must sign a nondisclosure agreement and agree to keep confidential all information, including but not limited to the identities of TDCJ employees, members of the drug team, and any other participant in the execution, obtained or learned by the inmate's approved spiritual advisor when participating in the inmate's scheduled execution.

C.      Violation of the nondisclosure agreement may subject the inmate's approved spiritual advisor to civil or criminal penalties under state law.

**IX.**      **TDCJ Employee Orientation**

A.      TDCJ employees shall receive an orientation with the Huntsville, Goree, Polunsky, or Mountain View Unit Wardens, who shall inform the employees of TDCJ Executive Directive 06.63, "Crisis Response Intervention Support Program," (CRISP).

B.      TDCJ employees shall be encouraged to contact the Regional CRISP Team Leader following their initial participation in the execution process.

# EXHIBIT C



Texas Department of Criminal Justice

Bryan Collier
Executive Director

*Via: eric@eallenlaw.com*

August 19, 2021

Eric Allen
Eric Allen Law
4200 Regent, Suite 200
Columbus, OH 43219

RE: John Henry Ramirez, TDCJ# 00999544

Mr. Allen:

The Texas Department of Criminal Justice (TDCJ) received your correspondence dated August 16, 2021, asking whether Mr. Ramirez's spiritual advisor is to remain silent upon entering the execution chamber and where the spiritual advisor will be standing throughout the procedure.

At this time, the TDCJ does not allow the spiritual advisor to pray out loud with the inmate once inside the execution chamber. In accordance with the TDCJ Execution Procedure policy, visitation with Mr. Ramirez's spiritual advisor may take place the morning of the scheduled execution at the Polunsky Unit. Mr. Ramirez may also request visitation with his spiritual advisor from 3:00 to 5:00 p.m. at the Huntsville Unit. During these times, the spiritual advisor will be permitted to pray out loud and provide spiritual guidance to Mr. Ramirez.

Once inside the execution chamber, the spiritual advisor will be positioned in a corner of the room where the individual must remain for the entirety of the procedure. Due to security concerns, the TDCJ will not disclose the precise distance of the spiritual advisor from the inmate while inside the execution chamber.

If you have further questions, please do not hesitate to contact this office.

Sincerely,

Kristen Worman
General Counsel

KLW/AML

*Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.*
**Office of the General Counsel**
P.O. Box 13084 Capitol Station                                    P.O. Box 4004
Austin, Texas 78711-3084                                          Huntsville, Texas 77342-4004
Phone (512) 463-9899, FAX (512) 936-2159          Phone (936) 437-6700, FAX (936) 437-6994
www.tdcj.texas.gov

# EXHIBIT D

## DECLARATION OF TINA CHURCH

My name is Tina Church and I have known Stephen Barbee and his Mother Jackie Barbee since 2005. I am over the age of 21 years old and m y address is 111 Livingston Bay Ct. Mishawaka, IN. 46544. My telephone number is 574-255-8364 and I own Specialized Investigative Consultants, Inc and am a licensed investigator in the State of Indiana in good standing.

I am fully aware of Stephen Barbee's religious beliefs as he is Pentecostal and has been since he was a child. As he grew up he taught Sunday school classes at his church, and was very active within the church as was his family. Stephen's Pastor's were Calvin and Nancy Clearly and Calvin Clearly passed away a few years ago, and his wife Nancy is now 90 years old and is unable to travel, but continues to stay in communication with Stephen.

Being Pentecostal as Stephen has been and continues to be it is part of his religion especially during illness and death it is practiced by Pentecostal people to pray together and to lay hands on upon the person.

I swear under the penalties of perjury that his Declaration is true and correct to the best of my knowledge.


Signed: _Tina Church_____ Dated: _09-16-21_

Location: _Mishawaka, IN. 46544_

# EXHIBIT E

I Stephen Barbee, hereby declare as follows:

My name is Stephen Barbee and am over the age of 21 and am competent to make this declaration. I am incarcerated on death row at the Polunsky Unit in Livingston, Texas. My Texas Department of Criminal Justice number is 999507.

I have known Nancy Cearley for around 30 years. Calvin Cearley her husband, (now passed) was the minister which married my wife and I in 1996. Both MR & MRS. Cearley have been my ministers all these years.

Pastor Nancy Cearley has been there for me when I needed her for all these years and has taught me so many things about Christainity.

Sinse my arrest in 2005 Nancy has been my minister on my visitation list, but was named only a friend because it was easier for visits, (for her coming in).

Only now as of late have I learned that Nancy had to be named a minister / Spiritual advisor on my visitation form, which should be done by now.

It is very important to me for Nancy Cearley to at least have her hand on my ankle area and be permitted to pray with me at the time of my death in the chamber, if or when I reach such time.

It's the words of a minister that matter's, especially when it's written in the Bible, that two or more should pray together. And with that Faith, I believe.

And I believe that with sister Nancy being a minister for many, many years that at that time of my death when I need to hear the words she will say, that help me have the Faith which is needed in all of us.

I declare under penalty of the laws of the State of Texas that the foregoing is true and correct to the best of my knowledge.
8-20-21
at 6:00 PM at Polunsky Unit

# EXHIBIT F

## Declaration of Adrián de la Rosa

I, Adrián de la Rosa, hereby declare as follows:

1. My name is Adrián de la Rosa and I am over the age of 21 and I am competent to make this declaration.  I am an investigator employed by the Federal Public Defender, Capital Habeas Unit, Western District of Texas, 919 Congress Ave., Ste. 950, Austin, Texas 78701, phone (737) 207-3007.

2. I visited Mr. Stephen Barbee, TDCJ No. 999507, at the Polunsky Unit, Livingston, Texas on September 3, 2021 at the request of his counsel, A. Richard Ellis.  This was my first visit with Mr. Barbee.  We spoke for about three and a half hours.

3. Mr. Barbee told me that his spiritual advisor is Barry Brown, who is with the Salvation Army.  He had to name his spiritual advisor 30 days out from his date.  He had to put someone down and Barry has done the orientation because he was there for Mr. Hummel on his date.

4. Mr. Barbee said he originally wanted (and put down) Nancy Clearly as his spiritual advisor and he said she agreed, but he later learned she was not able to attend as she is over 90 years old and has health problems. Mr. Barbee said the Polunsky chaplain said he called her, and she said she couldn't participate.  He then sent a letter to the warden saying Ms. Clearly couldn't serve as his spiritual advisor and added Mr. Brown's name.

5. After some confusion as to whether Ms. Clearly could attend, she did confirm that she would not attend, and Mr. Barbee finally settled on Mr. Brown.

6. Mr. Barbee said he has officially requested a spiritual advisor.

7. Mr. Barbee also said he's full gospel Pentecostal.

8. I asked Mr. Barbee about the status of his relationship with Mr. Brown. He said they met once before COVID, and he saw him again more recently.  They also have a scheduled visit on Tuesday, September 7, 2021.

9. Mr. Barbee said his specific desire is that if he does get to the gurney, he wants the minister to say something positive.  He said, "I'd like to hear that it's going to be okay…whatever he can say, maybe a passage out of the bible that will be calming."  He also said it would be nice to have someone there to hold his hand.

10. I declare under penalty of perjury of the State of Texas that the foregoing is true and correct to the best of my knowledge.

DATED:___09/16/2021_____     AT: Austin, Texas

_____
**Adrián de la Rosa**

# EXHIBIT G



**Texas Department of Criminal**

## STEP 1 — OFFENDER GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: 2022005712

Date Received: SEP 15 2021

Date Due: 10/25/21

Grievance Code: 300

Investigator ID #: I2731

Extension Date: _____

Date Ret'd to Offender: SEP 1 5 2021

Offender Name: Stephen Barbee      TDCJ # 999507

Unit: Polunsky      Housing Assignment: 12 AA 04

Unit where incident occurred: Polunsky

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Sgt. Barry Brown - Salvation Army      When? Sept 7th 2021

What was their response? He wont be able to touch me or speak to me in the chamber.

What action was taken? N/A

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate.

Sgt. Brown, my spiritual adviser told me that TDCJ would Not allow him to touch me or speak to me while I was in the death chamber, during my execution.

I am being deprived of my religious rights because I believe my spiritual adviser should touch me and say the appropriate words while I'm in the death chamber.

After-all a minister's words is what brings peace and persuasion in my religious beliefs.

Copy also sent to: A. Richard Ellis
Attorney at Law
75 Magee Ave.
Mill Valley, CA 94941

---

I-127 Front (Revised 11-2010)      **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**      (OVER)

Appendix F

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Action Requested to resolve your Complaint.** *I would like and need for my spiritual advisor to touch me and say the appropriate words during my execution in the chamber.*

**Offender Signature:** _Staple_   **Date:** _9-15-21_

**Grievance Response:**

Your grievance has been investigated. At this time the spiritual advisor is not allowed to touch the inmate or speak out loud once inside the execution chamber. No further action is warranted at this time

**Signature Authority:** _____ _B. Rigsby_ _AW_   **Date:** _9/16.21_

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**       ***Resubmit this form when the corrections are made.**

☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days. *
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments. *
☐ 5. No documented attempt at informal resolution. *
☐ 6. No requested relief is stated. *
☐ 7. Malicious use of vulgar, indecent, or physically threatening language. *
☐ 8. The issue presented is not grievable.
☐ 9. Redundant, Refer to grievance #_____
☐ 10. Illegible/Incomprehensible. *
☐ 11. Inappropriate. *

**UGI Printed Name/Signature:** _____

**Application of the screening criteria for this grievance is not expected to adversely Affect the offender's health.**

**Medical Signature Authority:**_____

| **OFFICE USE ONLY** | |
|---|---|
| Initial Submission | UGI Initials:_____ |
| Grievance #: | _____ |
| Screening Criteria Used: | _____ |
| Date Recd from Offender: | _____ |
| Date Returned to Offender: | _____ |
| **2ⁿᵈ Submission** | UGI Initials:_____ |
| Grievance #: | _____ |
| Screening Criteria Used: | _____ |
| Date Recd from Offender: | _____ |
| Date Returned to Offender: | _____ |
| **3ʳᵈ Submission** | UGI Initials:_____ |
| Grievance #: | _____ |
| Screening Criteria Used: | _____ |
| Date Recd from Offender: | _____ |
| Date Returned to Offender: | _____ |

I-127 Back (Revised 11-2010)

Appendix

# EXHIBIT H

Declaration of Jennifer Cherry

My name is Jennifer Cherry, and I am 40 years old, today is September 20th, 2021.

Stephen D Barbee is my uncle and because we are so close in age, we grew up more like a brother and sister. We were raised in a non-denomination church with Pentecostal roots. We were both active in church together, so much so that at one point, Stephen and his ex-wife were children's church leaders and I helped them with their puppet shows. It was a wonderful time in our lives.

There are a few important aspects of our faith that I'd like to address. First, we believe in praying aloud over the sick, those in need and the dying. We also believe that laying on of hands is fundamental in what Christ demonstrated as far as praying for people. If someone is sick or dying, we believe it is essential to speak aloud prayers and place our hands on the person and I know for a fact, Stephen believes these things as I have witnessed him being prayed over in church many times through the years.  If this is not allowed him, if and when he goes on to be with the Lord, it would be detrimental to his mental health, peace of mind and belief system at the time of his passing.

Stephen's religious beliefs were not suddenly found in prison as they are beliefs that have been deeply ingrained throughout his life and in which he fiercely believes in.  We are a family of faith and hold dear our principles in our religious principles.

I swear under the penalty of perjury that the above declaration is true and correct.


Thank you,



Jennifer Cherry

5055 W Hacienda Ave Unit 2068
Las Vegas, NV 89118
817-729-7801

# EXHIBIT I

# A. RICHARD ELLIS

| | |
|---|---|
| **Also admitted in:** | **Attorney at Law** |
| **Colorado** | **75 Magee Ave.** |
| **Florida** | **Mill Valley, CA 94941** |
| **Hawaii** | **Tel.: (415) 389-6771** |
| **Missouri** | **FAX: (415) 389-0251** |
| **Nebraska** | **a.r.ellis@att.net** |
| **Nevada** | |
| **Texas** | |
| **District of Columbia** | |

**September 15, 2021**

Mr. Bobby Lumpkin
Director, Correctional Institutions Division
Texas Department of Criminal Justice
Huntsville, Texas 77342

**Via email transmission to:**
**TDCJ General Counsel Kristen Worman: Kristen.Worman@tdcj.texas.gov**

**Re: Stephen Dale Barbee, TDCJ No. 999507, scheduled for execution on October 12, 2021.**

Dear Mr. Lumpkin:

I represent Stephen Dale Barbee (TDCJ No. 999507), who is scheduled for execution on October 12, 2021. Mr. Barbee has designated a spiritual advisor, Mr. Barry Brown, who has been approved to be present for his execution. I am writing to ask whether Mr. Brown will be required to remain silent upon entering the execution chamber, and whether he will be allowed to pray audibly with Mr. Barbee while in the execution chamber.

In your letter of August 19, 2021 regarding the execution procedures for John Ramirez (TDCJ No. 999544) you indicated that, pursuant to TDCJ policy, Mr. Ramirez's approved spiritual advisor will be prohibited from praying aloud in the execution chamber, would not be allowed to touch Mr. Ramirez, and would be positioned in a corner of the room in an undisclosed distance from Mr. Ramirez for the entirety of the procedure

The purpose of this communication is to make explicit that Mr. Barbee's request to have his designated spiritual advisor present in the execution chamber at the time of his execution encompassed a request that his advisor be permitted to audibly pray and physically touch Mr. Barbee to administer spiritual comfort and a blessing upon him at the time of his death.

I request that you confirm your intent to enforce the "No Speaking" and "No Contact" policies that you instituted in Mr. Ramirez's case, as articulated in the August 19, 2021 letter, against Mr. Barbee's approved spiritual advisor.

Should I not receive a response from you in the next 24 hours, I will infer from your silence that your position is the same as indicated for Mr. John Ramirez.

Sincerely,

*/s/ A. Richard Ellis*
A. Richard Ellis
Attorney for Stephen Dale Barbee, TDCJ No. 999507

-2-

RE: RE; STEPHEN DALE BARBEE TDCJ NO. 999507 (EXECUTION SCHEDULED OCT. 12, 2021)

From:  Amy Lee (amy.lee@tdcj.texas.gov)

To:  a.r.ellis@att.net

Cc:  kristen.worman@tdcj.texas.gov

Date:  Thursday, September 16, 2021, 05:18 PM PDT

Mr. Ellis,

The Texas Department of Criminal Justice (TDCJ) received your correspondence dated September 9, 2021, inquiring about whether any measures have been taken or planned to be taken regarding Mr. Barbee's long-standing arm immobility issues. The TDCJ also received your correspondence dated September 15, 2021, asking whether Mr. Barbee's spiritual advisor will be required to remain silent upon entering the execution chamber and whether the spiritual advisor will be allowed to pray audibly with Mr. Barbee while inside the execution chamber.

In response to both inquires, any concerns or complaints related to health-related matters or other confinement issues within the TDCJ's control are addressed by following the process as outlined in the Grievance Procedures for Offenders section of the TDCJ Offender Orientation Handbook. Mr. Barbee will need to follow the procedures as outlined for the TDCJ to aptly provide a response.

Amy Lee

Project Coordinator

Office of the General Counsel - TDCJ

*The information contained in this email and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other use of these materials is strictly prohibited. This email shall not be forwarded outside the Texas Department of Criminal Justice, Office of the General Counsel, without the permission of the original sender. If you have received this material in error, please notify me immediately by telephone and destroy all electronic, paper, or other versions.*

**From:** Richard Ellis <a.r.ellis@att.net>
**Sent:** Wednesday, September 15, 2021 3:43 PM
**To:** Kristen Worman <Kristen.Worman@tdcj.texas.gov>
**Subject:** RE; STEPHEN DALE BARBEE TDCJ NO. 999507 (EXECUTION SCHEDULED OCT. 12, 2021)