IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN BARBEE, | § | |
| *Plaintiff*, | § | |
| | § | CIV. ACT. NO. 4:21–CV–03077 |
| v. | § | **DEATH PENALTY CASE** |
| | § | ECF |
| BRYAN COLLIER, et al., | § | |
| *Defendants*. | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF
BARBEE'S MOTION FOR STAY OF EXECUTION
WITH BRIEF IN SUPPORT**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*STEPHEN M. HOFFMAN
Assistant Attorney General
Criminal Appeals Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711–2548
(512) 936–1400

*Counsel of Record

_____

ATTORNEYS FOR DEFENDANTS

_____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

RESPONSE IN OPPOSITION to motion for stay ...................................... 1

STATEMENT OF THE CASE .................................................................... 5

    I.    Facts of the Crime ..................................................................... 5

    II.    Facts Relating to Punishment ............................................... 10

    III.    Conviction and Postconviction Proceedings ...................... 10

    IV.    TDCJ's Execution Procedures and Barbee's Last-Minute Requests for Accommodations ................................. 13

        A.    TDCJ's post-*Murphy* policy ............................................ 13

        B.    TDCJ's current policy ..................................................... 14

        C.    Barbee's requests for TDCJ's accommodations ........ 16

ARGUMENT ......................................................................................... 17

    I.    Barbee's Dilatoriness Requires the Summary Denial of His Stay Motion. ....................................................... 17

    II.    Alternatively, the Court Should Deny a Stay Because the Equities Do Not Favor Barbee. ........................................ 22

        A.    Standard of review ......................................................... 22

        B.    This Court is bound by the Fifth Circuit's published *Ramirez* opinion ............................................ 24

        C.    Barbee fails to present a substantial case or make a strong showing that he is likely to succeed on the merits because he has not exhausted his administrative remedies ...................... 26

        D.    Barbee has not made a strong showing that he will succeed on the merits ............................................ 28

i

1.    RLUIPA claim............................................................... 28

2.    Free Exercise Clause claim.................................. 38

E.    Barbee will not suffer irreparable harm. ................... 40

F.    The State and the public have a strong interest
in seeing the state court judgment carried out. ....... 41

CONCLUSION ........................................................................ 43

CERTIFICATE OF SERVICE ................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004) .......................................... 28, 29

*Ali v. Wingert*, 569 F. App'x 562 (10th Cir. 2014) ........................................... 32

*Barbee v. Davis*, 139 S. Ct. 566 (2018) ............................................................ 12

*Barbee v. Davis*, 660 F. App'x 293 (5th Cir. 2016) .................................... 10, 11

*Barbee v. Davis*, 728 F. App'x 259 (5th Cir. 2018) ......................................... 10

*Barbee v. State*, AP–75,359, 2008 WL 5160202 (Tex. Crim. App. Dec. 10, 2008) ............................................................................................. 10, 11

*Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015) ....................................................................................................... 11

*Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 5123356 (N.D. Tex. Sept. 1, 2015) ................................................................................................. 11

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ................................................... 22, 40

*Barr v. Lee*, 140 S. Ct. 2590 (2020) ..................................................................... 4

*Berry v. Epps*, 506 F.3d 402 (5th Cir. 2007) .................................................... 18

*Bible v. Davis*, 4:18–CV–1893, 2018 WL 3068804 (S.D. Tex. Jun. 21, 2018)…… ..................................................................................... 17, 43

*Bible v. Davis*, 739 F. App'x 766 (5th Cir. 2018) ............................................. 17

*Booth v. Churner*, 532 U.S. 731 (2001) ........................................................... 26

*Bridge v. Collins*, 963 F.2d 767 (5th Cir. 1992) ............................................... 25

*Brown v. Collier*, 929 F.3d 218 (5th Cir. 2019) ................................... 28, 31, 39

*Brown v. Livingston*, 457 F.3d 390 (5th Cir. 2006) ......................................... 18

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019)............................................. 4, 19, 41

*Busby v. Collier, et al.*, No. 4:21–cv–297 (S.D. Tex.) ........................................ 14

*Buxton v. Collins*, 925 F.2d 816 (5th Cir. 1991) ............................................... 23

*Calderon v. Thompson*, 52 U.S. 538 (1998) ............................................... 23, 41

*Cantu v. Collins*, 967 F.2d 1006 (5th Cir. 1992) ......................................... 2, 25

*Crutsinger v. Davis*, 936 F.3d 265 (5th Cir. 2019) .......................................... 42

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)............................................. 33, 36, 38

*Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010) ............................................... 27

*Dunn v. Ray*, 139 S. Ct. 661 (2019)........................................................... 4, 19

*Dunn v. Smith*, 141 S. Ct. 725 (2021) ...................................................... 14, 35

*Ellis v. Collins*, 956 F.2d 76 (5th Cir. 1992) ................................................... 25

*Ex parte Barbee*, 616 S.W.3d 836 (Tex. Crim. App. 2021) .............................. 12

*Ex parte Barbee*, No. WR–71,070–01, 2009 WL 82360 (Tex. Crim. App. Jan.
    14, 2009) ................................................................................................. 11

*Ex parte Barbee*, No. WR–71,070–02, 2011 WL 4071985 (Tex. Crim. App.
    Sept. 14, 2011).......................................................................................... 11

*Ex parte Barbee*, No. WR–71,070–02, 2013 WL 1920686 (Tex. Crim. App. May
    8, 2013) ................................................................................................... 11

*Ex parte Barbee*, No. WR–71,070–03, 2019 WL 4621237 (Tex. Crim. App.
    Sept. 23, 2019)..................................................................................... 12, 20

*Fegans v. Johnson*, No. H–09–4019, 2010 WL 1425766 (S.D. Tex. Apr. 8,
    2010) ....................................................................................................... 27

*Garcia v. Castillo*, 431 F. App'x 350 (5th Cir. 2011) ....................................... 23

*Garcia v. Texas*, 564 U.S. 940 (2011) ............................................................ 25

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) ...................................................... 36

*Gomez v. United States Dist. Court*, 503 U.S. 653 (1992) ............................... 41

*Gonzales v. Collier*, No. 4:21–cv–828 (S.D. Tex.) ............................................ 14

*Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012) ................................................ 26

*Gutierrez v. Saenz*, 141 S. Ct. 127 (2020) ......................................................... 14

*Gutierrez v. Saenz, et al.*, No. 1:19–cv–185 (S.D. Tex.) ........................ 14, 33, 35

*Harris v. Johnson*, 376 F.3d 414 (5th Cir. 2004) ................................... 18, 19, 21

*Herrera v. Collins*, 506 U.S. 390 (1993) ............................................................ 23

*Hill v. McDonough*, 547 U.S. 573 (2006) ......................................... 4, 17, 22, 42

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ......................................................... 23

*Holt v. Hobbs*, 574 U.S. 352 (2015) ........................................................... 28, 29

*Johnson v. McCotter*, 804 F.2d 300 (5th Cir. 1986) ......................................... 25

*Jones v. Bock*, 549 U.S. 199 (2007) ................................................................... 26

*Kincy v. Livingston*, 173 F. App'x 341 (5th Cir. 2006) ................................... 19

*Lyng v. Nw. Indian Cemetery Protective Assoc.*, 485 U.S. 439 (1988) ....... 29, 31

*Martel v. Clair*, 565 U.S. 648 (2012) ................................................................. 42

*Murphy v. Collier*, 139 S. Ct. 1475 (2019) ........................................... 13, 33, 38

*Murphy v. Collier*, 942 F.3d 704 (5th Cir. 2019) ............................................. 28

*Mutawakkil v. Huibregtse*, 735 F.3d 524 (7th Cir. 2013) ............................... 32

*Nelson v. Campbell*, 541 U.S. 637 (2004) ...................................... 18, 22, 26, 41

*Neville v. Johnson*, 440 F.3d 221 (5th Cir. 2006) ...................................... 18, 25

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................. 23

*O'Bryan v. Estelle*, 691 F.2d 706 (5th Cir. 1982) ............................................ 40

*O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) .......................................... 39

*Ochoa v. Collier*, 802 F. App'x 101 (5th Cir. 2020) ....................................... 40

*Odneal v. Pierce*, C.A. C–04–454, 2009 WL 2982781 (S.D. Tex. Aug. 27, 2009) ...................................................................................................................... 36

*Oklevueha Native Am. Church of Hawaii, Inc. v. Lynch*, 828 F.3d 1012 (9th Cir. 2016) ...................................................................................................... 29

*Ramirez v. Collier*, (21A33), 2021 WL 4077814 (U.S. Sept. 8, 2021) .... 2, 16, 24

*Ramirez v. Collier*, 10 F.4th 561 (5th Cir. 2021) ..................................... passim

*Ramirez v. Collier*, 21–5592, 2021 WL 4129220 (U.S. Sept. 10, 2021) ............ .............................................................................................................. 16, 28, 40

*Ramirez v. Collier*, No. 4:21–cv–2609 (S.D. Tex.) ..................................... passim

*Reese v. Livingston*, 453 F.3d 289 (5th Cir. 2006) ......................................... 18

*Rhines v. Weber*, 544 U.S. 269 (2005) ............................................................. 42

*Ross v. Blake*, 136 S. Ct. 1850 (2016) .............................................................. 27

*Sells v. Livingston*, 561 F. App'x 342 (5th Cir. 2014) .................................... 23

*Selvage v. Collins*, 494 U.S. 108 (1990) .......................................................... 25

*Selvage v. Lynaugh*, 842 F.2d 89 (5th Cir. 1988) ........................................... 25

*Sherbert v. Verner*, 374 U.S. 398 (1963) ........................................................ 28

*Smith v. Johnson*, 440 F.3d 262 (5th Cir. 2006) ............................................ 18

*Turner v. Safley*, 482 U.S. 78 (1987) .......................................................... 39, 40

*Udey v. Kastner*, 805 F.2d 1218 (5th Cir. 1986) ................................. 36

*United States v. Vialva*, 976 F.3d 458 (5th Cir. 2020) ..................................... 42

*Whitaker v. Livingston*, 597 F. App'x 771 (5th Cir. 2015) ............................. 18

*White v. Johnson*, 429 F.3d 572 (5th Cir. 2005) ................................................ 18

*Whitley v. Albers*, 475 U.S. 312 (1986) ................................................................ 33

*Woodford v. Ngo*, 548 U.S. 81 (2006) .................................................................. 26

*Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001) ................................... 27

**Statutes**

28 U.S.C. § 2253 ....................................................................................................... 22

42 U.S.C. § 1983 ....................................................................................................... 13

42 U.S.C. § 1997e(a) ................................................................................................ 26

42 U.S.C. § 2000cc–1(a) ......................................................................................... 28

Tex. Code Crim. Proc. Art. 43.14 ......................................................................... 30

Tex. Gov't Code § 501.008 (West 2021) ............................................................. 27

Tex. Gov't Code § 552.1081 .................................................................................. 30

Tex. Pen. Code § 19.03(a)(7)(A) ............................................................................ 5

**Rules**

28 C.F.R. § 26.4 ....................................................................................................... 35

## Other Authorities

Brian Blueskye, Last rites among the coronavirus: Solemnity with additional
    safety precautions in place, Palm Springs Desert Sun (accessed Oct. 1,
    2021), https://www.desertsun.com/story/news/health/2020/04/13/how-
    local-clergy-deliver-last-rites-and-final-prayers-amid-
    coronavirus/2968818001/ ......................................................................... 32

Church of Jesus Christ of Latter Day Saints, Guidelines for Safely Returning
    to Church Meetings and Activities (accessed October 4, 2021),
    https://newsroom.churchofjesuschrist.org/multimedia/file/safely-return-
    to-church-meetings-activities-guidelines-2020.pdf ............................... 32

Episcopal Diocese of Los Angeles, Safe Return FAQs (accessed Oct. 2, 2021),
    https://diocesela.org/covid-19_faq/ ......................................................... 32

Joseph Brown, Texas resumes executions after 10-month halt, The Huntsville
    Item (accessed Sept. 23, 2021, 1:23 PM),
    https://www.itemonline.com/news/texas-resumes-executions-after-10-
    month-halt/article_5330c356-b902-11eb-9872-cb384cecbd00.html ...... 15

Texas death row inmate severs chaplain's arm with razor, CNN (accessed
    Sept. 29, 2021 11:48 AM),
    https://www.cnn.com/2000/US/06/09/texas.death.row/index.html ........ 34

Texas Death Row Inmates Take Guard Hostage, CBS News (accessed Sept.
    29, 2021 11:51 AM), https://www.cbsnews.com/news/texas-death-row-
    inmates-take-guard-hostage/. ................................................................. 34

The Prison Litigation Reform Act ............................................................. 26, 27

The Religious Land Use and Institutionalized Persons Act ...................passim

## RESPONSE IN OPPOSITION TO MOTION FOR STAY

Barbee murdered his pregnant ex-girlfriend and her seven-year-old son by suffocating them to death. Barbee confessed multiple times to killing the victims, had a motive to commit the crime, was caught burying the bodies, and led the police to where the bodies were buried. Pursuant to the order of the trial court, Barbee is scheduled to be executed sometime after 6:00 P.M. on October 12, 2021. As shown below, Barbee has already availed himself of the full panoply of state and federal appeals available to death-row inmates in Texas (including two subsequent state writ proceedings). Now, with his execution looming, he has filed a federal civil rights lawsuit. ECF No. 1. In his complaint, Barbee argues that he is entitled to have his spiritual advisor touch him and pray audibly in the execution chamber. Complaint Pursuant to 42 U.S.C. § 1983 (Compl.), ECF No. 1. He also moves for a stay of execution. Motion for Stay of Execution (Mot. Stay), ECF No. 6.

However, no stay of execution is warranted. Barbee's lawsuit is dilatory and pretextual. It was not until after the Supreme Court stayed another Texas execution on September 8, 2021, that Barbee suddenly decided to pursue this copycat claim. This lawsuit was brought five months after TDCJ amended its execution protocol to its current form and two-and-a-half months after Barbee's execution was first scheduled. Rather than filing promptly, Barbee delayed filing his lawsuit until just three weeks prior to his scheduled execution.

Further, this is not even Barbee's first execution date. Barbee was set for execution in October 2019. He did not raise this claim at that time, even though the prison's previous protocol did not provide for touching and audible prayer either. Barbee offers no compelling excuse for waiting until now, in last-minute litigation, to finally bring his claim. Therefore, the Court should deny a stay pursuant to the District, Circuit, and Supreme Court precedent set forth below.

This Court and the Fifth Circuit have both recently denied a stay in a case involving similar issues. *Ramirez v. Collier*, 10 F.4th 561 (5th Cir. 2021) (per curiam); Order, *Ramirez v. Collier*, No. 4:21–cv–2609, ECF No. 23 (S.D. Tex. Sept. 2, 2021). The Fifth Circuit's *Ramirez* decision conclusively resolves that no stay is warranted on a claim that a death-sentenced inmate is entitled to his spiritual advisor's touching or audible prayer in the execution chamber. Of course, the Supreme Court subsequently granted its own stay and certiorari in *Ramirez. Ramirez v. Collier*, (21A33), 2021 WL 4077814, at *1 (U.S. Sept. 8, 2021). However, the Supreme Court did not vacate the Fifth Circuit's opinion or state that it was wrongly decided, and a certiorari grant is not a merits decision. The Supreme Court's lack of vacatur is critical: "The [Supreme] Court's grant of certiorari in a capital case does not cause us to deviate from circuit law, nor is it grounds for a stay of execution." *Cantu v. Collins*, 967 F.2d 1006, 1012 n.10 (5th Cir. 1992). The Fifth Circuit's decision is binding on this Court.

In any event, Barbee fails to show any entitlement to the stay that he seeks. He is not likely to succeed on the merits for three reasons. First, Barbee failed to exhaust his administrative remedies, thereby precluding any relief on the merits. Second, TDCJ's execution protocol does not substantially burden his sincere exercise of religion. Barbee is not being compelled to violate his religious beliefs or significantly modify his religious behavior. And even if the alleged burden were substantial—though it is not—Barbee's request for religious accommodations is not sincere. Barbee did not raise his claim until after the Supreme Court stayed the Ramirez execution, suggesting that the requested accommodation only became important to him when he realized that it could delay his execution. Finally, TDCJ's policy is the least restrictive means of furthering TDCJ's compelling interests in prison security, conducting an orderly execution that respects the rights and dignity of the condemned, and facilitating justice and closure for Barbee's victims' family and loved ones.

Moreover, Barbee cannot show irreparable harm. This is a Section 1983 action, so Barbee necessarily does not challenge the fact that he is being put to death (if so, his suit would sound in habeas). Rather, the only harm that can be considered is that Barbee's advisor will not be able to touch him or audibly pray in the execution chamber. But this potential harm is greatly minimized by the fact that Barbee's advisor can pray with Barbee in the morning on the

day of the execution, shortly before the execution, and can also be present in the execution chamber.

And even if the Court does not agree that Barbee's dilatoriness presents an independent barrier to relief, that dilatoriness must still be considered in the weighing of the equities, and it cuts against Barbee. The suffering of the victims and their long wait for justice demands that the Court permit no further delays in the matter.

Barbee has the burden of persuasion on his stay request, and he is required to make "a clear showing" that he is entitled to a stay of execution. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). "Last-minute stays should be the extreme exception, not the norm[.]" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019); *see also Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020). As the Supreme Court has explained:

> "[T]he last-minute nature of an application" that "could have been brought" earlier, or "an applicant's attempt at manipulation," "may be grounds for denial of a stay." *Hill*, 547 U.S. at 584 (internal quotation marks omitted). So, for example, we have vacated a stay entered by a lower court as an abuse of discretion where the inmate waited to bring an available claim until just 10 days before his scheduled execution for a murder he had committed 24 years earlier. *See* [*Ray*, 139 S. Ct. at 661]. If litigation is allowed to proceed, federal courts "can and should" protect settled state judgments from "undue interference" by invoking their "equitable powers" to dismiss or curtail suits that are pursued in a "dilatory" fashion or based on "speculative" theories. [*Hill*, 547 U.S. at 584–85.]

*Bucklew*, 139 S. Ct. at 1134 (footnote omitted).

Barbee fails to make the requisite showing to justify interference by the federal courts. More than sixteen years have passed since Barbee brutally murdered his victims. The ensuing delay in carrying out Barbee's sentence should weigh heavily in the evaluation of this stay application, and justice for Barbee's victims should be denied no longer. Simply put, "[t]he people of [Texas], the surviving victims of Mr. [Barbee]'s crimes, and others like them deserve better." *Id*. at 1134. Accordingly, Barbee's request for a stay should be denied.

## STATEMENT OF THE CASE

### I.    Facts of the Crime

The Texas Court of Criminal Appeals (CCA) provided the following summary of Barbee's crimes:

> [Barbee] was charged with murdering Lisa Underwood and her seven-year-old son, Jayden Underwood, during the same criminal transaction. Tex. Pen. Code § 19.03(a)(7)(A). Lisa owned a bagel shop in Fort Worth with her friend Holly Pils. Pils testified that [Barbee], who was married, had been a customer at the bagel shop and that he and Lisa began a personal relationship in Fall 2003. They stopped seeing each other at the end of 2003, and Lisa began dating another man at the beginning of 2004. She was still dating the other man when she resumed her relationship with [Barbee] in July 2004, and she became pregnant around that time. She informed both men that she was pregnant but told [Barbee] that she believed he was the father of the unborn child. She told Pils that she wanted her baby to have health insurance and that she had discussed the matter with [Barbee].
>
> Pils testified that Lisa, who was more than seven months pregnant, stayed home from work on Friday, February 18, 2005,

because she had a cold. Pils planned to host a baby shower for Lisa at the bagel shop the next day. Lisa told Pils that she was feeling better, that she was excited about the baby shower, and that she planned to arrive at the bagel shop shortly before 4:00 p.m. on Saturday, February 19th.

At approximately 3:00 on Saturday morning, Denton County Deputy Sheriff David Brawner saw a man walking along the service road of Interstate Highway 35. Brawner stopped his patrol car behind the man and activated his overhead emergency lights and his "in-car video camera system." It was cold outside, and it had been raining. Brawner testified that the man's clothes were "very wet" and that he was "covered in mud." When Brawner asked the man for identification, he said that he had left his wallet at his friend's residence nearby. He gave the officer a false name and date of birth and "took off running on foot" when Brawner spoke with dispatch in an effort to verify the information. Brawner ran after the man, but he disappeared into a thickly wooded area. Brawner and other officers searched the area for hours but were unable to locate the man. Brawner later identified the man as [Barbee] in a photo spread.

The police were contacted after Lisa failed to show up for her baby shower later that day. There were no signs of forced entry at Lisa's house. Jayden's shoes were on top of the fireplace hearth, and his glasses had been left next to his bed. There was blood in the living room on the entertainment center, the walls, and a fitted couch cover. It appeared that someone had attempted to clean and conceal a saturation blood stain on the living room floor. Lisa's car was gone, and there was blood on the floor in the garage. Lisa's DNA profile was consistent with the blood stains in the house and the garage. Her personal home computer showed that she logged on to the internet at 11:22 p.m. on February 18 and logged off at 12:02 a.m. on February 19. The last website she visited was "birthplan.com."

On February 21, Lisa's Dodge Durango was found in a creek approximately 300 yards from where Officer Brawner had encountered [Barbee] two days earlier. The front end of the vehicle was submerged in the creek. The windows were down and the hatchback was up. There was a bottle of cleaning solution in the

cargo area of the vehicle. Lisa's car keys and purse were located nearby.

On the same day that Lisa's car was found, Detectives Michel Carroll, John McCaskell, and Brian Jamison of the Fort Worth Police Department traveled to Tyler to speak with [Barbee], his wife Trish Barbee, and his co-worker Ron Dodd. The detectives initially talked to them in the parking lot of a Wal–Mart, but later asked them to come to the Tyler Police Department for further questioning. At the police department, Carroll and Jamison interviewed [Barbee] in one room, and McCaskell interviewed Dodd in another room. [Barbee] received his *Miranda* warnings and his interview began at about 7:45 p.m. In this interview, which was recorded on a digital video disc (DVD), [Barbee] said that he worked cutting down trees in Tyler during the day on February 19. He said that he drove to his home in Fort Worth that evening and that he went over to Dodd's house later that night to work on the truck that they used as their business vehicle. He left Dodd's house at around 2:00 or 3:00 a.m. It took over an hour for him to drive home because the truck was "sputtering" and "leaking oil." His wife was asleep when he arrived home, and he slept on the couch so he would not wake her. He acknowledged that he had dated Lisa and that she had informed him he might be the father of her unborn child, but he claimed that he had not seen or heard from her in a while. He eventually acknowledged that he had been stopped by a police officer in Denton County at around 3:00 a.m., that he had given the officer a false name and date of birth, and that he had run away from the officer.

Carroll testified that he excused himself to observe McCaskell's interview with Dodd, then he returned to [Barbee]'s interview room and asked, "Does FM 407 sound familiar to you?" He placed photographs of Lisa and Jayden on the table and walked out of the room, leaving [Barbee] alone. [Barbee] later opened the door and asked to use the men's room. Carroll accompanied him to the bathroom where they had an un-recorded conversation for about forty-five minutes to one hour. Carroll testified that he told [Barbee] that Dodd was "going to lay this whole thing in [Barbee's] lap" and that "Lisa's family needed closure." [Barbee] made comments "about being locked up [for] the rest of his life" and said that he understood the need for closure because he had lost a

family member. [Barbee] told Carroll that "he and Dodd actually created a plan to go kill Lisa" because "Lisa wanted to use his name on a birth certificate or she was trying to take money from him, she was going to ruin his family, his relationship with his wife, Trish, and he did not want that to happen." [Barbee] said that he dropped his car off at Dodd's house and then Dodd drove him to Lisa's house. Dodd left, and [Barbee] went inside and tried to "pick a fight" with her. He was unable to provoke a fight, so he called Dodd to pick him up. He later had Dodd take him back to Lisa's house. This time, "he was able to get him upset enough that he could start a fight with her." He wrestled her to the ground and "held her face into the carpet until she stopped breathing." Jayden came into the room and was "crying" and "emotional." [Barbee] said he walked up to Jayden, placed his hand over his mouth and nose, and "held it there until he stopped breathing." Afterwards, [Barbee] "tried to clean up the house" and "tried to cover a blood spot with a piece of furniture." He placed the bodies of Lisa and Jayden into Lisa's car and drove to "a road off of FM 407 where they buried both their bodies." He said that he used a shovel Dodd had given to him and that he buried the bodies in a shallow grave and placed debris on top of it. He then drove Lisa's car to another location and "stopped it just short of the creek." After relating this story, [Barbee] agreed to have another digitally recorded video interview with Carroll.

Carroll testified that he and [Barbee] left the bathroom and went to Detective Richard Cashell's desk where [Barbee] assisted them in mapping out the location where he had buried the victims. They used "MapQuest" to "get a map of that area" and [Barbee] showed them "the roads that he traveled" and where he "put the victims' bodies." Carroll and [Barbee] then went back to the interview room where [Barbee] gave his second digitally recorded video statement shortly after 11:00 p.m.

After Carroll interviewed [Barbee], he left the interview room and spoke with [Barbee]'s wife, Trish Barbee. Carroll told Trish that [Barbee] had confessed to killing Lisa and that he wanted to talk to her. Trish wanted to speak with [Barbee], so Carroll brought her to the interview room. Carroll remained outside, and the digital video recorder continued running as [Barbee] and Trish conversed. Trish asked [Barbee] what

happened. [Barbee] explained that Lisa called him and threatened him, so he went to her house and tried to talk to her. He said that Lisa said she would "ruin" him and that she fought with him and kicked him. He explained that he "held her down too long" and that he "didn't mean for her to stop breathing."

Carroll testified that [Barbee] spent that night in the Smith County Jail. The next morning, he rode with Carroll and Officer Mark Thornhill and directed them to the location of the bodies. Carroll testified that [Barbee] stated, "[W]hen I take you to the bodies, I don't want to see the bodies, and I don't want the media to see me." When they got closer to the location, [Barbee] told the officers to take a different exit and "took [them] a back route to the same location." When they arrived, [Barbee] sat in the car and directed them to the grave by yelling out the window. Carroll testified that Dodd had already taken police to "the same area," but that the bodies were not located until [Barbee] arrived. The bodies were located in a shallow grave that had tree limbs placed on top of it.

The medical examiner who performed Lisa's autopsy testified that Lisa suffered facial abrasions and contusions and a broken arm. She had bruises on both sides of her back that could have been caused by being hit or by having "external force applied over a longer period of time." Her injuries were consistent with a person holding her down and stopping her from breathing. The cause of her death was "traumatic asphyxiation," and the manner of her death was homicide. Lisa was pregnant with a healthy female fetus that appeared to be around seven months gestational age. The cause of the fetus' death was "fetal asphyxiation" resulting from "maternal asphyxiation."

The medical examiner who performed Jayden's autopsy testified that Jayden had a large bruise above his right temple that was "due to some sort of impact to the head." He had bruises on his back and abrasions on his back, arm, hip, and leg. He had bruises on his lips and gums that appeared to be "caused by some sort of compression, some object put over the area of the mouth and pressing on the mouth and compressing the lips against the underlying teeth." The medical examiner testified that Jayden's injuries were consistent with: someone placing a hand over

9

Jayden's mouth and nose; someone pressing Jayden's face against
a flat surface; or, someone pressing Jayden's face against a surface
that "gives if you push against it," like a couch or a carpeted floor.
He determined that the cause of Jayden's death was "asphyxia by
smothering" and the manner of his death was homicide.

*Barbee v. State*, AP–75,359, 2008 WL 5160202, at *1–3 (Tex. Crim. App. Dec.

10, 2008) (footnotes omitted), *cert. denied*, 558 U.S. 856 (Oct. 5, 2009).

## II.    **Facts Relating to Punishment**

The Fifth Circuit offered the following description of the punishment

evidence:

At the punishment phase, the State presented testimony
from Barbee's ex-wife, Theresa Dowling, that Barbee had
assaulted her during their marriage. Dowling also testified that
Barbee confessed to her shortly after he confessed to the police.
The State also presented testimony from a former coworker who
claimed that Barbee verbally abused her after she refused his
advances. Barbee presented testimony from friends, family, and
acquaintances attesting to his good deeds and good character.[1]
Barbee also presented testimony from a prison security expert who
testified that Barbee would be able to successfully serve a life
sentence, a confinement officer who knew Barbee well, and a
confinement officer who had observed Barbee's good behavior
while in jail. The jury ultimately sentenced Barbee to death.

*Barbee v. Davis*, 728 F. App'x 259, 260–62 (5th Cir. 2018).

## III.    **Conviction and Postconviction Proceedings**

Barbee was convicted of capital murder and sentenced to death in 2006.

*State v. Barbee*, No. 1004856R, 2006 WL 6916746 (213th Jud. Dist. Ct., Tarrant

---

[1]    Barbee's presentation at the punishment phase is discussed in further detail in [the
Fifth Circuit's] COA opinion. *See Barbee v. Davis*, 660 F. App'x 293, 318–19 (5th Cir. 2016).
[footnote in original]

Co., Tex. Feb. 27, 2006). He unsuccessfully sought appellate and state postconviction relief. *Barbee*, 2008 WL 5160202; *Ex parte Barbee*, No. WR–71,070–01, 2009 WL 82360 (Tex. Crim. App. Jan. 14, 2009) (per curiam) (not designated for publication).

After Barbee filed his federal habeas petition, the district court allowed him to return to state court to raise previously unpresented claims. *Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 4094055, at *2 (N.D. Tex. July 7, 2015). Barbee then filed a subsequent state habeas application. *Id*. After remanding a claim for a hearing, the CCA denied habeas relief on the remanded claim and dismissed the other claims as abusive. *Ex parte Barbee*, No. WR–71,070–02, 2011 WL 4071985 (Tex. Crim. App. Sept. 14, 2011) (per curiam) (not designated for publication); *Ex parte Barbee*, No. WR–71,070–02, 2013 WL 1920686 (Tex. Crim. App. May 8, 2013) (per curiam) (not designated for publication).

Upon Barbee's return to federal court, the district court denied Barbee habeas relief, denied his application for a certificate of appealability (COA), and denied his motion to alter or amend judgement. *Barbee*, 2015 WL 4094055, at *67; *Barbee v. Stephens*, No. 4:09–CV–074–Y, 2015 WL 5123356 (N.D. Tex. Sept. 1, 2015). Barbee then filed an application for a COA in the Fifth Circuit. The Fifth Circuit granted a COA on one claim. *Barbee*, 660 F. App'x at 300. After subsequent briefing and oral argument, the Fifth Circuit affirmed the

denial of habeas relief. *Barbee*, 728 F. App'x at 260–70. The Supreme Court denied certiorari review. *Barbee v. Davis*, 139 S. Ct. 566 (2018).

On May 9, 2019, the 213th Judicial District Court of Tarrant County scheduled Barbee for execution on October 2, 2019. *Ex parte Barbee*, No. WR–71,070–03, 2019 WL 4621237, at *2 (Tex. Crim. App. Sept. 23, 2019) (per curiam) (not designated for publication). Barbee filed a subsequent state habeas application on August 6, 2019. *Id.* The CCA stayed the execution on September 23, 2019 and ordered briefing. *Id.* On February 10, 2021, the CCA dismissed the application as an abuse of the writ. *Ex parte Barbee*, 616 S.W.3d 836 (Tex. Crim. App. 2021). His certiorari petition was denied on October 4, 2021. *Barbee v. Texas*, No. 21–5093.

On July 6, 2021, the 213th Judicial District Court of Tarrant County entered an order setting Barbee's execution for October 12, 2021. Barbee filed a motion to withdraw the execution date on September 9, 2021. Barbee also filed a subsequent state habeas application and a related motion to stay on October 1, 2021. Barbee filed an amended motion to stay on October 4, 2021. The motion to withdraw, the motion to stay, and the subsequent habeas application are currently pending.

## IV.   TDCJ's Execution Procedures and Barbee's Last-Minute Requests for Accommodations

On March 28, 2019, the Supreme Court stayed TDCJ inmate Patrick Murphy's execution based on his 42 U.S.C. § 1983 claims challenging TDCJ's refusal to permit a Buddhist spiritual advisor in the execution chamber while permitting Christian or Muslim chaplains to be present. *Murphy v. Collier*, 139 S. Ct. 1475 (2019). Finding TDCJ's former policy unconstitutional for its denominational discrimination, Justice Kavanaugh provided two potential solutions: TDCJ could allow all inmates to have an advisor of their religion in the execution chamber, or it could exclude all such advisors from the chamber, allowing them in the witness viewing room instead. *Id.* at 1475–76 (Kavanaugh, J., concurring).

### A.   TDCJ's post-*Murphy* policy

On April 2, 2019, TDCJ changed its protocol such that no religious advisors were permitted in the execution chamber. Pl.'s Ex. A at 8, ECF No. 1. To accommodate inmates' religious practices, TDCJ facilitated visitation on execution day with a TDCJ chaplain or an outside spiritual advisor. *Id.* During the execution, the advisor was allowed to be present in the witness viewing room. *Id.*

TDCJ's post-*Murphy* policy formed the basis of several Section 1983 complaints alleging that the spiritual advisor's exclusion from the chamber

13

violated the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First Amendment. Compl., *Ramirez*, No. 4:21–cv–2609, ECF No. 1 (S.D. Tex. Aug. 7, 2020); Compl., *Gutierrez v. Saenz, et al.*, No. 1:19–cv–185, ECF No. 1 (S.D. Tex. Sept. 26, 2019); Compl., *Busby v. Collier, et al.*, No. 4:21–cv–297, ECF No. 1 (S.D. Tex. Jan. 29, 2021) (with intervenor plaintiffs Quintin Jones and Ramiro Ibarra); Compl., *Gonzales v. Collier*, No. 4:21–cv–828, ECF No. 1 (S.D. Tex. Mar. 12, 2021). Gutierrez obtained a stay of execution based on his Section 1983 complaint. *Gutierrez v. Saenz*, 141 S. Ct. 127 (2020). And after the Supreme Court declined to vacate a stay based on Alabama's similar policy, *see Dunn v. Smith*, 141 S. Ct. 725 (2021), TDCJ revised its policy again.

## B.   TDCJ's current policy

TDCJ published a revised Execution Procedure on April 21, 2021, which delineates a process for the approval of an inmate's spiritual advisor to be present in the execution chamber at the time of the execution. Pl.'s Ex. B at 2, ECF No. 1. The following procedure applies:

- "Upon the inmate's receipt of the Notification of Execution Date . . ., the inmate shall have thirty (30) days to submit a request in writing to the Death Row Unit Warden to have a TDCJ Chaplain or the inmate's spiritual advisor present inside the execution chamber during the inmate's scheduled execution."

- "The inmate's spiritual advisor must be included on the inmate's visitation list and have previously established an ongoing spiritual relationship with the inmate demonstrated by regular communications or in-person visits with the inmate before the inmate's scheduled execution date."

- The death-row inmate must provide the Death Row Unit Warden with contact information for the spiritual advisor, after which the warden will contact the spiritual advisor.

- Within fourteen (14) days of being contacted by the Death Row Unit Warden, the spiritual advisor will provide specific credentials demonstrating his official status as a spiritual advisor.

- TDCJ will perform a background check on the spiritual advisor.

- Before approval to be in the execution chamber, "the spiritual advisor must satisfactorily complete a two (2) hour, in-person orientation with a staff member of the Rehabilitation Programs Division a minimum of ten (10) days before the inmate's scheduled execution date."

*Id*. at 3–4. If denied the presence of his requested spiritual advisor, the inmate may appeal to the Director of the TDCJ Criminal Institutions Division. *Id*. at 4.

This policy was employed by the prison during the execution of Quintin Jones.[2] John Henry Ramirez's spiritual advisor was also approved for entry into the chamber. Order at 7, *Ramirez*, No. 4:21–cv–2609, ECF No. 23 ("TDCJ will accommodate Ramirez's religious beliefs by giving Ramirez access to his pastor on the day of execution and allowing him to stand nearby during the execution."). However, Ramirez filed a Section 1983 suit before his September

---

[2]     Joseph Brown, <u>Texas resumes executions after 10-month halt</u>, The Huntsville Item (accessed Sept. 23, 2021, 1:23 PM), https://www.itemonline.com/news/texas-resumes-executions-after-10-month-halt/article_5330c356-b902-11eb-9872-cb384cecbd00.html ("Jones' execution was the first carried out in Texas that allowed for a non-TDCJ employed spiritual advisor to be present in the chamber.")

8, 2021 execution date, ultimately alleging after several amendments that his advisor should also be allowed to touch him and pray aloud in the chamber. *See* Second Am. Compl., *Ramirez*, No. 4:21–cv–2609, ECF No. 12. The Court denied Ramirez's motion for stay of execution, and Ramirez appealed. Order, *Ramirez*, No. 4:21–cv–2609, ECF No. 23. The Fifth Circuit affirmed the district court in a published opinion and denied Ramirez's motion for stay of execution. *Ramirez*, 10 F.4th 561. But the Supreme Court—without vacating the lower court's decision—granted a stay of execution and certiorari accompanied by expedited briefing and argument. *Ramirez*, 2021 WL 4077814, at *1. The Supreme Court subsequently requested briefing on relevant issues, including exhaustion. *Ramirez v. Collier*, 21–5592, 2021 WL 4129220, at *1 (U.S. Sept. 10, 2021).

### C.   Barbee's requests for TDCJ's accommodations

On September 15, 2021, Barbee's counsel emailed TDCJ General Counsel a letter requesting that Barbee's spiritual advisor be allowed to make physical contact with Barbee and audibly pray during his execution. Pl.'s Ex. I, ECF No. 1. The next day, TDCJ personnel responded by referring counsel to the grievance process. *Id*.

On September 15, 2021, Barbee filed a Step 1 grievance, complaining that his advisor would not be able to touch him or speak in the execution chamber, and, on September 16, 2021, TDCJ denied it. Pl.'s Ex. G, ECF No. 1.

Barbee states that "[u]pon information and belief, Mr. Barbee has submitted a Stage 2 grievance in order to exhaust his administrative remedies. Documentation will be forthcoming as soon as it is received." Compl. at 10, ECF No. 1. The Defendants have ascertained that a Step 2 grievance was filed on October 1, 2021 and is currently pending. Def.'s Ex. E.

On September 21, 2021, Barbee filed the instant suit against TDCJ pursuant to Section 1983 and RLUIPA, based on TDCJ's denial of his request for his spiritual advisor to make physical contact with him and audibly pray during his execution. Compl., ECF No. 1. Barbee seeks a stay of execution pending its resolution. Mot. Stay, ECF No. 6.

## ARGUMENT

### I.   Barbee's Dilatoriness Requires the Summary Denial of His Stay Motion.

In *Hill*, the Supreme Court stated that "[t]he federal courts can and should protect States from dilatory or speculative suits[.]" 547 U.S. at 585. This Court should heed the Supreme Court's exhortation. Both this Court and the Fifth Circuit have previously endorsed the denial of a stay of execution based solely on a lack of timeliness, independent of other factors, without considering the merits of the underlying claims. *Bible v. Davis*, 4:18–CV–1893, 2018 WL 3068804, at *5 (S.D. Tex. Jun. 21, 2018), aff'd, 739 F. App'x 766 (5th Cir. 2018) (capital plaintiff's "unnecessary delay in filing suit and seeking equitable relief

is an independent basis on which the Court will deny relief"); *Berry v. Epps*, 506 F.3d 402, 404–05 (5th Cir. 2007) (per curiam); *White v. Johnson*, 429 F.3d 572, 573–74 (5th Cir. 2005) (per curiam); *Harris v. Johnson*, 376 F.3d 414, 417 (5th Cir. 2004) (per curiam); *see also Brown v. Livingston*, 457 F.3d 390, 391 (5th Cir. 2006); *Smith v. Johnson*, 440 F.3d 262, 263–64 (5th Cir. 2006); *Reese v. Livingston*, 453 F.3d 289, 290–91 (5th Cir. 2006); *Neville v. Johnson*, 440 F.3d 221, 222–23 (5th Cir. 2006) (per curiam). In the lethal-injection context, petitioners who dilatorily raise previously available claims immediately before their execution are not entitled to a stay regardless of whether they state a cognizable claim under Section 1983.

Barbee's plainly dilatory attempts at obtaining a stay of execution are of the type the Supreme Court has cautioned against. *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004). The path forward for Barbee to raise a challenge to TDCJ's execution protocol—i.e., exhaustion of administrative remedies followed by the filing of a civil rights action—has been clear since at least his execution date was set. He chose not to take that path at all, initially, and then only at a time that deprives this Court of the opportunity to permit factual development and then consider the merits of his claims. Such dilatory tactics should not be countenanced, and Barbee is not entitled to a stay at this late date. *Id.*; *see Whitaker v. Livingston*, 597 F. App'x 771, 774 (5th Cir. 2015) ("This court has clearly held that waiting until an execution date is set or until

some point closer to execution would 'serve no purpose but to further delay justice.'") (quoting *Harris*, 376 F.3d at 419); *Kincy v. Livingston*, 173 F. App'x 341, 342–43 (5th Cir. 2006).

Indeed, the Supreme Court itself has identified dilatoriness as a valid barrier to the pursuit of a last-minute spiritual advisor claim. In *Ray*, the Supreme Court allowed an execution to proceed, based on dilatoriness, when the plaintiff raised a spiritual advisor claim a mere "10 days before his scheduled execution for a murder he had committed 24 years earlier."[3] *Bucklew*, 139 S. Ct. at 1134 (citing *Ray*, 139 S. Ct. at 661). This was notwithstanding the fact that Ray was raising what was then a novel claim.

Contrary to his arguments, *see* Mot. Stay at 5–7, ECF No. 6, Barbee is not similarly situated to other plaintiffs that received stays on spiritual advisor claims. Barbee himself acknowledges that the claims themselves in *Gutierrez* and *Smith* were different—those plaintiffs complained of the complete denial of spiritual advisor access to the chamber. Mot. Stay at 7, ECF No. 6. Moreover, Barbee did not even file his Step 1 grievance raising touching and audible-prayer-issues until after the Supreme Court granted certiorari in *Ramirez*.

---

[3]     "Yet although he had been on death row since 1999, and the state had set a date for his execution on Nov. 6, 2018, he waited until Jan. 23, 2019—just 15 days before the execution—to ask for clarification. He then brought a claim 10 days before the execution and sought an indefinite stay. This delay implicated the 'strong equitable presumption' that no stay should be granted." *Bucklew*, 139 S. Ct. at 1134 n.5.

Barbee merely latched onto these claims once they gained traction as grounds to delay an execution.

Here, TDCJ instituted its current execution protocol on April 21, 2021—five months ago.[4] Barbee could have challenged the protocol then, but he chose not to. Barbee's execution was set on July 6, 2021—three-and-a-half months ago. Again, Barbee could have contested the protocol then, but he chose not to. Indeed, Barbee was also set for execution in October 2019[5], and he did not challenge the previous protocol then either, even though TDCJ's prior protocol *completely barred* spiritual advisors from the chamber. Pl.'s Ex. A at 8, ECF No. 1. Instead, it was not until after the Supreme Court stayed Ramirez's execution on September 8, 2021, that Barbee suddenly decided to pursue this claim by filing suit on September 21, 2021—a mere twenty days before his scheduled execution date on October 12, 2021. As in *Ramirez*, "the shifting of [Plaintiff]'s litigation posture indicates that the change in position is strategic and that delay is the goal." *Ramirez*, 10 F.4th at 561 (Owen, J., concurring).

Barbee complains that the Court must grant him a stay because the Defendants will not accelerate the litigation schedule to resolve this case before his execution. Mot. Stay at 10–11, ECF No. 6. But that is precisely the point of

---

[4]       This was with Barbee's execution imminent. The State had just filed its Second Motion for Court to Enter Order Setting Execution Date on March 30, 2021.

[5]       *Ex parte Barbee*, 2019 WL 4621237, at *2.

the above precedent. Instead of bringing this suit in a timely manner, Barbee is doing "the very thing the plaintiff is not entitled to do . . . namely, to wait until his execution is imminent before suing to enjoin the state's method of carrying it out." *Harris*, 376 F.3d at 417 (citation omitted). Specifically,

> [b]y waiting until the execution date was set, [Barbee] left the state with a [Hobson's] choice: It could either accede to [his] demands and execute him in the manner he deems most acceptable, even if the state's methods are not violative of the [Constitution]; or it could defend the validity of its methods on the merits, requiring a stay of execution until the matter could be resolved at trial. Under [Barbee's] scheme, and whatever the state's choice would have been, it would have been the timing of [his] complaint, not its substantive merit, that would have driven the result.

*Id*. "By waiting as long as he did, [Barbee] leaves little doubt that the real purpose behind his claim[s] is to seek a delay of his execution, not merely to effect an alteration of the manner in which it is carried out." *Id*. at 418.

The Defendants had no control over when Barbee filed his lawsuit. His unjustifiable delay is forcing the Court to depart from regular order and deal with pleadings on what amounts to an emergency basis. It likewise burdens the Defendants, who are forced to respond to these last-minute filings. This Court should refuse to countenance this dilatoriness and follow the Supreme Court's direction in *Hill* by denying a stay solely based on lack of timeliness without considering the merits.

## II.   Alternatively, the Court Should Deny a Stay Because the Equities Do Not Favor Barbee.

### A.   Standard of review

"Filing an action that can proceed under § 1983 does not entitle the [plaintiff] to an order staying an execution as a matter of course." *Hill*, 547 U.S. at 584. "It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id*. (citing *Nelson*, 541 U.S. at 649–50). "It is well-established that petitioners on death row must show a "reasonable probability" that the underlying issue is "sufficiently meritorious" to warrant a stay and that failure to grant the stay would result in "irreparable harm." *Barefoot v. Estelle*, 463 U.S. 880, 895 (1983), superseded on other grounds by 28 U.S.C. § 2253(c)(2). Indeed, "[a]pplications for stays of death sentences are expected to contain the information and materials necessary to make a careful assessment of the merits of the issue and so reliably to determine whether plenary review and a stay are warranted." *Id*. To demonstrate an entitlement to a stay, a petitioner must demonstrate more than "the absence of frivolity" or "good faith" on the part of petitioner. *Id*. at 892–93. Rather, the petitioner must make a substantial showing of the denial of a federal right. *Id*. In a capital case, a court may properly consider the nature of the penalty in deciding whether to grant a stay, but "the severity of the penalty does not in itself

suffice." *Id.* at 893. The State's "powerful and legitimate interest in punishing the guilty," as well as its interest in finality, must also be considered, especially in a case such as this where the State and victims have for years borne the "significant costs of federal habeas review." *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (both the State and the victims of crime have an important interest in the timely enforcement of a sentence).

Thus, in deciding whether to grant a stay of execution, the Court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also Buxton v. Collins*, 925 F.2d 816, 819 (5th Cir. 1991). "In a capital case, the movant is not always required to show a probability of success on the merits, but he must present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities[,] i.e., the other three factors[,] weighs heavily in favor of granting a stay." *Garcia v. Castillo*, 431 F. App'x 350, 355 (5th Cir. 2011) (cleaned up); *see Sells v. Livingston*, 561 F. App'x 342, 344 (5th Cir. 2014).

**B.** **This Court is bound by the Fifth Circuit's published *Ramirez* opinion.**

Barbee asserts that the Court's analysis should be influenced by the Supreme Court's grant of certiorari in *Ramirez*. Mot. Stay at 8–9, ECF No. 6. However, this argument is contrary to Circuit precedent governing the treatment of certiorari grants. As shown below, it is the Fifth Circuit's *Ramirez* decision that controls the resolution of Barbee's stay motion.

In *Ramirez*, the Fifth Circuit was also confronted with a plaintiff who wanted his spiritual advisor to touch him and audibly pray while in the execution chamber. And, like Barbee, Ramirez asked for relief under RLUIPA and the Free Exercise Clause. *Ramirez*, 10 F.4th at 561. The Fifth Circuit nevertheless denied any stay of execution in a published opinion. *Id*. This per curiam opinion—while brief—must be read to stand for the proposition that these claims do not warrant a stay of execution in the eyes of the Fifth Circuit. *Id*. (Dennis, J., dissenting) ("Today, the majority affirms [the district court's denial of Ramirez's stay motion] and denies Ramirez a stay.").[6]

The Defendants acknowledge that the Supreme Court later granted certiorari and stayed Ramirez's execution. *Ramirez*, 2021 WL 4077814, at *1. However, the Supreme Court did not vacate the Fifth Circuit's decision, *see id*., and therefore the Fifth Circuit opinion remains good law. A grant of certiorari

---

[6] Even the dissent agreed that Ramirez could not prevail on his Free Exercise claim. *Id*. (Dennis, J., dissenting).

by the Supreme Court is not binding precedent—unlike published Fifth Circuit authority. *Neville*, 440 F.3d at 222 ("Although the Supreme Court has granted a writ of certiorari [. . .] our precedent . . . remains binding until the Supreme Court provides contrary guidance"). The Fifth Circuit has long made clear that "[t]he [Supreme] Court's grant of certiorari in a capital case does not cause us to deviate from circuit law, nor is it grounds for a stay of execution." *Cantu*, 967 F.2d at 1012 n.10 (citing *Johnson v. McCotter*, 804 F.2d 300, 301 (5th Cir. 1986)); *Bridge v. Collins*, 963 F.2d 767, 770 n.5 (5th Cir. 1992) ("We are cognizant of the Supreme Court's grant of certiorari [. . .] This court, however, is bound by the law of this Circuit."); *Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir. 1992). Consequently, this Court must apply "the settled law of our circuit until it is changed by the [Fifth Circuit] or the Supreme Court has plainly signaled a change." *Selvage v. Lynaugh*, 842 F.2d 89, 95 (5th Cir. 1988), *vacated sub nom.*, *Selvage v. Collins*, 494 U.S. 108 (1990).

Indeed, this Court would be remiss to stay the case based on a death-row inmate's predicted change in the law—i.e., how the Supreme Court may eventually rule in *Ramirez. See, e.g., Garcia v. Texas*, 564 U.S. 940, 941 (2011) ("Our task is to rule on what the law is, not what it might eventually be."). Guessing what the Supreme Court may or may not decide in a particular case is a speculative endeavor inconsistent with the orderly administration of the court system. *Selvage*, 842 F.2d at 94–95 ("We would find it [ ] difficult

rationally to order outcomes if we were required to guess the meaning of unexplained grants of a stay or writs of certiorari."). Instead, the Court must proceed under the Fifth Circuit's controlling precedent and deny any stay.

**C.    Barbee fails to present a substantial case or make a strong showing that he is likely to succeed on the merits because he has not exhausted his administrative remedies.**

Section 1997(e) of the PLRA[7] provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is *mandatory* "irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 739–40 n.6 (2001); *see Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) ("[T]here can be no doubt that pre-filing exhaustion of [the] prison grievance processes is mandatory.") (citing *Woodford v. Ngo*, 548 U.S. 81 (2006) & *Jones v. Bock*, 549 U.S. 199 (2007)). The PLRA's exhaustion requirement applies to Barbee's challenge to TDCJ's execution procedure. *See Nelson*, 541 U.S. at 643, 650 (concluding that a prisoner's complaint about the procedure used to find a vein during the execution process was a Section 1983 civil rights complaint and subject to the PLRA exhaustion requirement); *Ross v. Blake*,

---

[7]    The Prison Litigation Reform Act.

136 S. Ct. 1850, 1862 (2016) ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.").

Barbee's counsel's email correspondence with TDCJ General Counsel, *see* Pl.'s Ex. I, ECF No. 1, did not satisfy the mandatory exhaustion requirement under PLRA, and nor did Ramirez's. *See*, *e.g.*, *Fegans v. Johnson*, No. H–09–4019, 2010 WL 1425766, at *13 (S.D. Tex. Apr. 8, 2010) (concluding that a prisoner's attorney sending a notice of claims did not satisfy the PLRA exhaustion requirement). Barbee may only exhaust via TDCJ's grievance process, as reflected by TDCJ's response to Barbee's counsel. Pl.'s Ex. I, ECF No. 1; Tex. Gov't Code § 501.008 (West 2021); *see Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion."). And to properly exhaust, a prisoner must "pursue the grievance remedy to conclusion." *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). This requires completion of both steps of TDCJ's grievance process before a complaint may be filed. *Id*. Barbee only completed his Step 1 grievance—he did not file or receive a ruling on a Step 2 grievance—before filing suit. Compl. at 10, ECF No. 1; Def.'s Ex. E. Because Barbee did not exhaust administrative remedies prior to bringing his claims in federal court,

27

PLRA mandates dismissal of the complaint.[8] Accordingly, Barbee's failure to exhaust his administrative remedies requires dismissal of his complaint. If the merits of his complaint cannot be considered due to a lack of exhaustion, Barbee cannot make the required substantial showing required by the harm analysis.

### D. Barbee has not made a strong showing that he will succeed on the merits.

#### 1. RLUIPA claim

To establish a claim under RLUIPA, Plaintiff must show that the challenged government conduct substantially burdens his sincere religious exercise. 42 U.S.C. § 2000cc–1(a); *see also Brown v. Collier*, 929 F.3d 218, 228–29 (5th Cir. 2019). Plaintiff specifically bears the burden of showing that the "request for an accommodation" is "sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015). A substantial burden is one that "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 569–70 (5th Cir. 2004) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)). But a policy "does not rise to the level of a

---

[8]     In *Murphy*, the Fifth Circuit stated that it was following the lead of the Supreme Court in rejecting TDCJ's PLRA exhaustion defense. *Murphy v. Collier*, 942 F.3d 704, 708 (5th Cir. 2019). However, the Supreme Court's order for briefing on the exhaustion issue in *Ramirez* suggests that exhaustion in fact applies across the board or was limited based on facts specific to *Murphy*. *Ramirez*, 2021 WL 4129220, at *1.

substantial burden on religious exercise if it merely prevents the adherent from either enjoying some benefit . . . not . . . generally available or acting in a way that is not otherwise generally allowed." *Adkins*, 393 F.3d at 570. "Incidental effects" of policies, "which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are not a substantial burden within the meaning of RLUIPA. *Lyng v. Nw. Indian Cemetery Protective Assoc.*, 485 U.S. 439, 450–51 (1988); *see also Oklevueha Native Am. Church of Hawaii, Inc. v. Lynch*, 828 F.3d 1012, 1016 (9th Cir. 2016).

To begin, Barbee's plainly dilatory claim cannot satisfy RLUIPA's sincerity prong. If touching and audible prayer in the chamber were important to Barbee, he could have filed suit when the current protocol was adopted—or even during last-minute litigation pertaining to his 2019 execution date. The belated nature of this lawsuit strongly suggests that these practices were not significant to him until he apprehended—after Ramirez's stay—that requesting an accommodation could potentially delay his execution.

And even if Barbee's request had some kernel of religious sincerity, Barbee's dilatory conduct demonstrates that his claim is impermissibly driven by "some other motivation." *Holt*, 574 U.S. at 360–61. Barbee waited until September 7 to discuss his religious issues with his spiritual advisor. Pl.'s Ex. G, ECF No. 1. September 7 was the day after Judge Dennis indicated in his

29

*Ramirez* dissent that Ramirez's identical claims might justify a stay of execution. *Ramirez*, 10 F.4th at 561 (Dennis, J., dissenting). Further, it was not until after the Supreme Court granted a stay in *Ramirez* on September 8 that Barbee drafted his Step 1 grievance to mirror the claims raised in that case. Pl.'s Ex. G, ECF No. 1 (received September 15, 2021). In fact, as late as September 13, 2021, Barbee disclaimed even needing a spiritual advisor in the chamber. Def.'s Ex. F.[9] In short, Barbee's brand-new demands for physical touch and audible prayer are plainly motivated by a desire to delay his execution—his claim to protected religious exercise is pretext.

If there were any doubt that Barbee's true motive is to delay his execution by any means, the Court need look no further than the *other* Step 1 grievance Barbee filed on September 15. Def.'s Ex. G. This grievance and Barbee's related subsequent state habeas application contend that Barbee's arms cannot be straightened without causing him pain and that executing him would be tantamount to torture. Subsequent Application for Writ of Habeas Corpus at 5, 60–61, *Ex parte Barbee*, No. WR–71,071–04 (Tex. Crim. App.) (dated Oct. 1, 2021). This complaint, too, could have been raised years ago.

---

[9]     The Defendants have redacted this declaration pursuant to Section 552.1081 of the Texas Government Code and article 43.14 of the Texas Code of Criminal Procedure, which make confidential the name, address, and identifying information of "any person who participates in an execution procedure."

Moreover, even if Barbee could overcome his insincerity, he runs headlong into RLUIPA's substantial-burden prong. TDCJ allows outside spiritual advisors into the execution chamber but does not allow them to speak out loud or touch the inmates. Pl.'s Ex. G, ECF No. 1 (TDCJ's response to Barbee's grievance). However, Barbee is allowed to visit with his advisor on the morning of his execution, and then again from 3:00 to 5:00 p.m. prior to his execution. Pl.'s Ex. B at 7, 9, ECF No. 1. During these times, Barbee's chosen advisor may pray aloud with him. And when it is time for his sentence to be carried out, Barbee's chosen advisor may stand with him in the execution chamber and pray silently. *Id.* at 10. "[Plaintiff] has not identified any case requiring more or specifically finding a right to vocal prayer and holding the condemned man's hand during an execution." Order at 6, *Ramirez*, No. 4:21–cv–2609, ECF No. 23.

TDCJ is not forcing or enticing Barbee to do anything. Having amended its policy to facilitate religious visitation on the day of the execution and to allow inmates to choose the spiritual advisor who will stand with them in the final moments of their lives, TDCJ does limit conduct inside the execution chamber. But while this limit may preclude certain actions, it does not force an inmate to do what his religious tenets forbid. *See Brown*, 929 F.3d at 229 (requiring a showing that Defendants' acts pressured or coerced Plaintiff to behave in a manner violating his religious beliefs); *Lyng*, 485 U.S. at 450–51.

Physical contact and audible prayer may be Barbee's preference, "but preference . . . is not the standard." *Mutawakkil v. Huibregtse*, 735 F.3d 524, 527 (7th Cir. 2013); *see also Ali v. Wingert*, 569 F. App'x 562, 564–65 (10th Cir. 2014) (Gorsuch, J.). Indeed, having a spiritual advisor in one's immediate presence, holding hands and praying aloud at the moment of death is often not available to persons in the free world—especially in the current environment of COVID-19, which has led hospitals to ban clergy members from patient bedsides and many churches to take extra precautions when administering last rites by "pray[ing] . . . without touching" and using "some form of a Q-tip or cotton ball to anoint the heads and hands instead of [touching with] our fingers."[10] Thus, TDCJ's prohibition against physical touch and audible prayer once inside the execution chamber is no more of a burden to Barbee's religious beliefs than COVID-19 has placed on the religious exercise of persons in the free world.

And even if an inmate proves a policy substantially burdens his religious practice, it does not violate RLUIPA if it is the "least restrictive means" of

---

[10]     *See* Brian Blueskye, Last rites among the coronavirus: Solemnity with additional safety precautions in place, Palm Springs Desert Sun (accessed Oct. 1, 2021), https://www.desertsun.com/story/news/health/2020/04/13/how-local-clergy-deliver-last-rites-and-final-prayers-amid-coronavirus/2968818001/; *see also*, *e.g.*, Episcopal Diocese of Los Angeles, Safe Return FAQs (accessed Oct. 2, 2021), https://diocesela.org/covid-19_faq/ (allowing last rights only where they may be performed in a socially distanced fashion); Church of Jesus Christ of Latter Day Saints, Guidelines for Safely Returning to Church Meetings and Activities (accessed October 4, 2021), https://newsroom.churchofjesuschrist.org/multimedia/file/safely-return-to-church-meetings-activities-guidelines-2020.pdf.

furthering a compelling governmental interest. *See Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005). This standard is particularly sensitive to prison security concerns. *Id.* at 723. It allows prison administrators to take prophylactic measures to prevent or reduce such risks before they occur. *See*, *e.g.*, *Whitley v. Albers*, 475 U.S. 312, 322 (1986). And it requires courts to exercise "due deference to the experience and expertise of prison administrators in establishing . . . procedures to maintain . . . order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723. Prisons have a strong interest in controlling their execution chambers and ensuring that executions are safely conducted. *Murphy*, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring)); *see also* Order re Security Concerns at 19, 24, *Gutierrez*, No. 1:19–cv–185, ECF No. 124.

Here, the Court must consider the possibility of interference with the execution, the safety of the participants, and the importance of strictly controlling execution procedures. While TDCJ chaplains have previously been allowed in the chamber, TDCJ has explained that:

> Unlike the trusted TDCJ employees who participate in executions, an outside spiritual advisor is unknown to our agency. Outside spiritual advisors have no demonstrated loyalty to the mission of TDCJ or the State of Texas. They may, instead, feel a loyalty to the inmate. They may be intensely averse to the death penalty and may wish to prevent the execution, to cause a disruption to gain attention from media witnesses, or to take other actions against the imposition of the sentence.

33

*See* Def.'s Ex. C at 2. TDCJ's concerns are not imagined, as outside religious volunteers have been caught smuggling contraband, carrying messages to evade TDCJ review of inmate mail, and otherwise creating security threats. Def.'s Ex. B.

As reflected by news reports, spiritual advisors themselves are not immune to prison violence, even in a setting as locked down as Texas's death row.[11] Indeed, even trained guards risk violence by death row inmates.[12] Security around the execution chamber is not infallible.[13] And the emotions attendant to an execution recently caused a disturbance in the viewing room.[14]

Five Supreme Court Justices who have written or signed an opinion on the spiritual advisor issue have acknowledged that allowing an outsider into

---

[11]     "A Texas death row inmate [ ] grabbed the arm of a volunteer chaplain, tied it with a sheet to a toilet and nearly sawed it off with a razor blade[.]" <u>Texas death row inmate severs chaplain's arm with razor</u>, CNN (accessed Sept. 29, 2021 11:48 AM), https://www.cnn.com/2000/US/06/09/texas.death.row/index.html.

[12]     "Two armed death row inmates grabbed a female correctional officer [ ] and [held] her hostage." <u>Texas Death Row Inmates Take Guard Hostage</u>, CBS News (accessed Sept. 29, 2021 11:51 AM), https://www.cbsnews.com/news/texas-death-row-inmates-take-guard-hostage/.

[13]     "A defiant condemned killer who had tried to escape from death row at least twice spit out a handcuff key as lethal drugs began taking effect during his execution Tuesday." Associated Press, <u>Inmate Spits Out Key During His Execution</u>, The Los Angeles Times (accessed Sept. 28, 2021 12:49 PM), https://www.latimes.com/archives/la-xpm-2000-mar-15-mn-9112-story.html.

[14]     "[D]uring the execution, Coble's son began pounding on the glass of the death chamber, and after an interaction with officers in the room, he and his son were removed from the viewing room and taken to the Walker County jail, arrested on charges of resisting arrest." <u>Texas executes Billie Coble, the oldest man put to death in the state during modern era of the death penalty</u>, The Texas Tribune (accessed Sept. 28, 2021 1:39 PM), https://www.texastribune.org/2019/02/28/billie-coble-execution-texas/.

the chamber poses a security risk. *See Murphy*, 139 S. Ct. at 1475–76 (Kavanaugh, J., concurring); *Smith*, 141 S. Ct. at 725–26 (Kagan, J., concurring, joined by Breyer, J., Sotomayor, J., and Barrett, J.) and (Kavanaugh, J., dissenting); *accord* Order re Security Concerns at 19, *Gutierrez*, No. 1:19–cv–185, ECF No. 124 (recognizing that "precaution requires precisely crafted policy" for executions). To mitigate the risk, the Justices have offered potential solutions, sanctioning the Federal Bureau of Prisons' (BOP) execution policy as one of them.

Following the Justices' advice in devising a new policy, TDCJ implemented its current policy, which tracks the BOP's protocol for executions by allowing outside spiritual advisors into the chamber. *See* Order re Security Concerns at 19, 24, *Gutierrez*, No. 1:19–cv–185, ECF No. 124 (citing BOP memorandum outlining its execution procedure); 28 C.F.R. § 26.4. Consistent with the Supreme Court's guidance, TDCJ further tailored its policy to the least restrictive means of furthering its compelling security interest.

The Defendants have submitted a declaration from TDCJ-CID Director Bobby Lumpkin explaining the manifest risk-mitigation concerns underlying TDCJ's policy not to permit an advisor's audible prayer or touching. This declaration details how TDCJ's execution policy is painstakingly tailored to the

size/layout of the execution chamber[15] and crafted to the specific needs of TDCJ's drug team, TDCJ staff, the murder victims' family members, and media witnesses.[16] Def.'s Ex. C.

If the Court overrides TDCJ prison administrators' execution policy, it is sure to entangle itself and its sister courts in the execution process. *Cutter*, 544 U.S. at 726 ("Should inmate requests for religious accommodations . . . jeopardize the effective functioning of an institution, the facility would be free to resist the imposition."); *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (noting that federal courts are not to become "enmeshed in the minutiae of prison operations"); *Odneal v. Pierce*, C.A. C–04–454, 2009 WL 2982781, at *5 (S.D. Tex. Aug. 27, 2009) ("The Fifth Circuit has explained that federal courts 'are not to micromanage state prisons.'") (quoting *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004)). More inmate accommodation requests would be sure to follow, in which federal courts would be asked to micromanage the details of the spiritual advisor. *Cf. Udey v. Kastner*, 805 F.2d 1218, 1221 (5th Cir. 1986) ("We believe that the probable proliferation of claims, and the concomitant entanglement with religion that processing *multiple* claims would require,

---

[15]     *See also* Def.'s Ex. A (photographs of the execution chamber).

[16]     The United States itself recognizes that the specifics of states' execution chambers and execution procedures may not allow for some BOP practices, which apparently include some limited audible prayer and touching on an ad hoc basis. *See* Brief for the United States as Amicus Curiae Supporting Neither Party at 24–26, 28–29, *Ramirez v. Collier*, No. 21–5592 (U.S. Sept. 27, 2021).

does constitute a problem that the state has a good reason to avoid.") (emphasis in original). Courts should not become entangled in the minutia of a highly sensitive and secure process that requires elevated control and precision by prison administrators.[17] *See* Order at 7, *Ramirez*, No. 4:21–cv–2609, ECF No. 23.

TDCJ's execution protocol is tailored to protect the State's interest in ensuring an orderly execution that respects the dignity of the inmate while facilitating justice and closure for the families of victims. A spiritual advisor touching the inmate and speaking during the execution would interfere with the drug team's ability to monitor the inmate for any unintended adverse effects. *See* Def.'s Ex. C. And the spiritual advisor's placement next to the inmate would block the line of sight for either the drug team or the witnesses, who include the inmate's family, the victims' family, and representatives of the media.

Finally, the relief Barbee seeks will require TDCJ to accommodate rituals from other religions, too. TDCJ's accommodation of one religion's

---

[17]     For similar reasons, Barbee is not entitled under the PLRA to the relief he seeks because "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). "The Court shall not grant or approve any prospective relief unless the court finds such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* Moreover, *"[t]he Court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." Id.* (emphasis added).

37

blessing in the chamber, to the possible future exclusion of others, effectively reintroduces the denominational discrimination that the Supreme Court required TDCJ to remove. *See Murphy*, 139 S. Ct. at 1475; *see also Cutter*, 544 U.S. at 720 (citing *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet et al.*, 512 U.S. 687 (1994)) (indicating that RLUIPA's prescriptions must "be administered neutrally among different faiths"). In fact, TDCJ has already received a Step 1 grievance from another death row inmate with an imminent execution date asking that his spiritual advisor be allowed to place a hand over his heart, while praying aloud during the execution, and also be able to close the inmate's eyes at the time of his death. Def.'s Ex. D; *see also Murphy*, 139 S. Ct. at 1483 (Alito, J., dissenting) (discussing "chanting while a lethal injection is administered").

Barbee fails to make a substantial case on the merits of his RLUIPA claim because TDCJ's execution protocol does not substantially burden his sincere exercise of religion. And even if it did, the policy is the least restrictive means of furthering TDCJ's compelling interests. *See Cutter*, 544 U.S. at 712; *see* Order at 8, *Ramirez*, No. 4:21–cv–2609, ECF No. 23. Consequently, Barbee is not entitled to a stay of execution for his RLUIPA claim.

### 2.    Free Exercise Clause claim

Plaintiff also claims that TDCJ's policy violates the First Amendment's Free Exercise Clause. Compl. at 12–13, ECF No. 1. Where a Plaintiff claims a

prison regulation violates his rights under the Free Exercise Clause, courts must apply the test from *Turner v. Safley*, 482 U.S. 78 (1987). Under *Turner*, the challenged "regulation is valid if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (citing *Turner*, 482 U.S. at 89); *Brown*, 929 F.3d at 232.

Given the Supreme Court's recognition of the security risk posed by an outsider's presence in the execution chamber and proposed mitigation thereof, it is difficult to argue that TDCJ's policy is not "reasonably related to legitimate penological interests." *O'Lone*, 482 U.S. at 349 (citing *Turner*, 482 U.S. at 89); *Brown*, 929 F.3d at 232. Indeed, Barbee's claim plainly fails to satisfy *Turner*'s test. First, Barbee cannot show that TDCJ's revised protocol is not rationally connected to its security interest. *See Turner*, 482 U.S. at 89. Second, he cannot show there are no alternative means for him to exercise his religion, as TDCJ is allowing his spiritual advisor to enter the chamber and TDCJ's revised protocol also allows Barbee's spiritual advisor to visit and pray with him for up to two hours—from 3:00 to 5:00 p.m.—immediately prior to his execution after 6:00 p.m., as well as during morning visitation. Pl.'s Ex. B at 7, 9, ECF No. 1; *Turner*, 482 U.S. at 90. Third, Barbee is not likely to succeed on the merits of his claim considering the impact the accommodation—i.e., the "ripple effect"— would have on prison resources. *Turner*, 482 U.S. at 90. Lastly, Barbee is not likely to succeed in showing the existence of a readily available alternative.

*Turner*, 482 U.S. at 90. Because Barbee fails to make a substantial case on the merits of his Free Exercise Claim, he is not entitled to a stay of execution to pursue it. *See* Order at 8–9, *Ramirez*, No. 4:21–cv–2609, ECF No. 23; *Ramirez*, 10 F.4th 561[18]; *Ramirez*, 2021 WL 4129220, at *1 (briefing order requesting arguments on RLUIPA but not Free Exercise Clause).

### E.     Barbee will not suffer irreparable harm.

In a capital case, a court may properly consider the nature of the penalty in deciding whether to grant a stay, but "the severity of the penalty does not in itself suffice." *Barefoot*, 463 U.S. at 893. Citing habeas law, Barbee argues that his execution constitutes irreparable harm. Mot. Stay at 11, ECF No. 6 (citing *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982)). But this is a Section 1983 action, which means that Barbee necessarily does not challenge the validity of his sentence. *Cf. Ochoa v. Collier*, 802 F. App'x 101, 106 (5th Cir. 2020), *cert. denied*, 140 S. Ct. 990 (2020). Even under the theories of his lawsuit, when Barbee is executed, his sentence has only been lawfully fulfilled—that is not irreparable harm. Rather, the actual harm that Barbee alleges is that he will be deprived of physical touching and audible prayer while in the chamber. But because Barbee's dilatory requests are pretextual and are instead only intended to delay his execution, that deprivation is no harm at all. And, in any

---

[18]     Again, it appears that no member of the Fifth Circuit panel—including the dissent—found entitlement to relief on the Free Exercise theory.

event, Barbee will have access to his spiritual advisor in time frame shortly before his execution and that advisor will be inside the execution chamber, severely attenuating his alleged harm. Indeed, Barbee will have access to his advisor in the morning and for two hours prior to the proceedings, including up to an hour before the execution itself. Pl.'s Ex. B at 7, 9, ECF No. 1. Barbee may even choose to say his own prayer as part of the last statement he is permitted to give before the execution begins. Def.'s Ex. C at 4. While Barbee may disagree with the exact mechanics of this process, the prison has not cut him off from spiritual recourse in his last moments.

### F. The State and the public have a strong interest in seeing the state court judgment carried out.

The State and crime victims have a "powerful and legitimate interest in punishing the guilty." *Calderon*, 523 U.S. at 556 (citation omitted). And "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a [death] sentence." *Bucklew*, 139 S. Ct. at 1133 (quotation omitted); *see Nelson*, 541 U.S. at 650 ("a State retains a significant interest in meting out a sentence of death in a timely fashion"); *Gomez v. United States Dist. Court*, 503 U.S. 653, 654 (1992) (per curiam) ("[e]quity must take into consideration the State's strong interest in proceeding with its judgment"). Once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension." *Calderon*, 523 U.S. at 556. "Only with an

assurance of real finality can the State execute its moral judgment in a case" and "the victims of crime move forward knowing the moral judgment will be carried out." *Id.* The State should be allowed to enforce its "criminal judgments without undue interference from the federal courts." *Crutsinger v. Davis*, 936 F.3d 265, 273 (5th Cir. 2019) (citations and internal quotations omitted).

Here, the public's interest lies in executing sentences duly assessed, and for which years of judicial review have found no reversible error. Barbee has already passed through the state and federal collateral review process. The public's interest is not advanced by postponing Barbee's execution any further, and the State opposes any action that would cause further delay. *Martel v. Clair*, 565 U.S. 648, 662 (2012) ("Protecting against abusive delay *is* an interest of justice.") (emphasis in original). Barbee killed a pregnant woman and a child. Sixteen years after the commission of Barbee's crime, justice should no longer be denied. *See*, *e.g.*, Order at 9, *Ramirez*, No. 4:21–cv–2609, ECF No. 23 ("the public has an [interest] 'in timely enforcement of the death sentence.'") (citing *United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020)).

Moreover, it bears repeating that "capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of a sentence of death." *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005). Thus, "[t]he federal courts can and should protect States from dilatory or speculative suits[.]" *Hill*, 547 U.S. 585. As noted above, this lawsuit—belatedly filed three

42

weeks before the execution—is precisely the sort of "dilatory tactic" that the Supreme Court has suggested that this Court not entertain. Even if the Court does not consider Barbee's dilatory behavior an independent ground for the denial of relief, it should still weigh heavily in the Court's analysis. Any stay should be denied.

## CONCLUSION

For the foregoing reasons, the Defendants ask that the Court deny any stay of execution. Alternatively, the Court should deny any stay and dismiss Barbee's lawsuit. *See*, *e.g.*, *Bible*, 2018 WL 3068804, at *11 ("Because this lawsuit cannot proceed without a stay of [Plaintiff]'s execution date, dismissal of the action is warranted.").

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
   for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

\*Attorney-in-charge

<u>s/ Stephen M. Hoffman</u>
\*STEPHEN M. HOFFMAN
Assistant Attorney General
Texas Bar No. 24048978
Southern District Bar No. 602073
P. O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936–1400
Fax: (512) 320–8132
Email: Stephen.Hoffman@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

44

## CERTIFICATE OF SERVICE

I do hereby certify that on October 4, 2021, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Allen Richard Ellis
Law Office of A. Richard Ellis
75 Magee Ave., Mill Valley, CA, 94941
Email: a.r.ellis@att.net

s/ Stephen M. Hoffman
STEPHEN M. HOFFMAN
Assistant Attorney General
