## DECLARATION OF BOBBY LUMPKIN

1. My name is Bobby Lumpkin. I am over the age of 21 years, of sound mind, capable of making this declaration, and have personal knowledge of the facts stated herein. I am the Director of the Correctional Institutions Division (CID), a division of the Texas Department of Criminal Justice (TDCJ) located in Huntsville, Texas. I was appointed to this position on August 10, 2020. I began my career as a correctional officer with the TDCJ in 1990 and was promoted through the security ranks to assistant warden. In 2003, I was promoted to the Administrative Review and Risk Management Division to serve as the TDCJ's American Correctional Association Accreditation Manager. In 2007, I was promoted to Deputy Division Director of the Private Facility Contract Monitoring/Oversight Division. In 2013, I was promoted to Division Director of the Manufacturing and Logistics Division, which later became the Manufacturing, Agribusiness and Logistics (MAL) Division, and I held that position until I became the Director of the CID.

2. I have been asked to provide information and context regarding the TDCJ Execution Procedure as it relates to a spiritual advisor's presence in the execution chamber during an inmate's execution.

3. The process for developing or changing execution protocols is one of careful consideration. Execution policies and protocols are informed by the judgment of TDCJ officials, their past experiences, and their knowledge of human behavior in the prison and execution contexts. A policy change is often discussed among multiple TDCJ officials who have particularized expertise on the subject matter. Changing the Execution Procedure also involves coordination with other state agencies, including the Office of the Attorney General. Execution policies and protocols are developed to balance: (1) providing closure for the victims of the crime; (2) ensuring the security of TDCJ staff and witnesses; and (3) ensuring the highest level of dignity that the process will allow for the inmate.

4. In revising the TDCJ Execution Procedure in April 2021, I, along with Bryan Collier and others, determined that we could allow an approved non-TDCJ spiritual advisor ("outside spiritual advisor") to stand inside the execution chamber under the close supervision of a security escort standing next to him. This would allow the inmate a direct line of sight to his spiritual advisor, as the spiritual advisor would stand about three feet from the inmate. We determined that the revised procedure provided the most permissive accommodation of religion while still protecting the security of the execution process, those involved, and the interests of the victims, witnesses, and the public.

5.  I understand Inmate Stephen Barbee has requested that his outside spiritual advisor be allowed to physically touch him and pray aloud during the execution. TDCJ cannot safely accommodate either of these requests without introducing substantial risk.

6.  First, the Execution Procedure's prohibitions against physical touch of the inmate and audible speech help mitigate the risk that the outside spiritual advisor will attempt to frustrate the execution. Unlike the trusted TDCJ employees who participate in executions, an outside spiritual advisor is unknown to our agency. Outside spiritual advisors have no demonstrated loyalty to the mission of TDCJ or the State of Texas. They may, instead, feel a loyalty to the inmate. They may be intensely averse to the death penalty and may wish to prevent the execution, to cause a disruption to gain attention from media witnesses, or to take other actions against the imposition of the sentence.

7.  The TDCJ execution chamber is a small rectangular room that is approximately nine feet wide by twelve feet long. Most of the chamber is taken up by the gurney, which is approximately two feet wide by seven feet long, not including the arm span, which extends approximately six and one-half feet at its widest point from the right hand to the left hand. The spiritual advisor stands approximately three feet from the end of the gurney. This three-foot separation between the spiritual advisor and the inmate and the spiritual advisor's silence are necessary to mitigate the risk introduced by permitting an outsider inside the execution chamber.

8.  While the likelihood of any particular risk materializing may be low, the resulting harm could not be higher. A spiritual advisor touching the inmate would be within reach of the restraints securing at least one of the inmate's limbs and could attempt to release the inmate. The spiritual advisor could attempt to pull the IV lines as drugs are administered, which may inflict pain or suffering on the inmate. Any outburst in the execution chamber would cause emotional distress to the families of the victim and inmate, who are observing from the witness rooms. And in the event the condemned inmate escaped his restraints, smuggled in a weapon, or otherwise became a threat in the execution chamber, a spiritual advisor standing close enough to touch the inmate would be in harm's way or in a position to assist the inmate.

9.  Second, the prohibitions on touch and audible speech are necessary to ensure the execution team notices and can respond to any indications of irregularities in the execution and can pronounce the inmate's death. The medical professionals participating in the execution, called the "drug team," observe the execution through a one-way window from a separate room adjacent to the execution chamber. The drug team observes the execution through the window to protect their identities. A microphone positioned above the inmate's body provides audio to the drug team from the execution chamber.

10.     The drug team must have a completely unobstructed view of the inmate and the IV lines so that they may monitor the inmate's physical reaction. They also must be able to hear any sound coming from the inmate. The slightest reaction, movement, or sound from the inmate could indicate regained consciousness or suffering. Once the lethal drugs are administered, the inmate is observed again for signs of life so that additional solution may be administered if necessary.

11.     The spiritual advisor's physical contact or audible speech would hinder the drug team's ability to make these observations. If a spiritual advisor were permitted to stand immediately next to the gurney with a hand placed on the inmate, the drug team's view of the IV lines and/or the inmate's body would be obstructed. And physical contact between the spiritual advisor and inmate would create ambiguity regarding the source of any observed movements by the inmate.

12.     Likewise, if the spiritual advisor were permitted to audibly pray during or after the administration of the drugs, the drug team's ability to listen for sounds from the inmate would be obstructed.

13.     If the drug team fails to see, hear, or identify a problem with the IV lines or the inmate's reaction, the results could be dire. It would be unacceptable for a condemned inmate to experience pain or otherwise suffer from the administration of the lethal drugs. To my knowledge, none of the State of Texas's executions have resulted in an unintended reaction, pain, or suffering, though I am aware of reports of this occurring in other jurisdictions.

14.     Third, witnesses from the victim's family, the inmate's chosen witnesses, and media witnesses—who report on the execution to the public—must have a line of sight to the inmate and the ability to hear any sounds coming from the inmate. The spiritual advisor's positioning next to the inmate and audible speech would obstruct the witnesses' observation.

15.     Finally, the spiritual advisor's placement immediately next to the gurney would complicate the response of TDCJ personnel and the drug team in the event of a problem with the IV lines or an unintended reaction to the lethal drugs. The execution chamber is a small room. Its dimensions are approximately nine feet by 12 feet. During an execution, the chamber feels crowded, as it holds the inmate, the gurney, two TDCJ staff members, and the spiritual advisor. The drug team, the Warden, and the CID Director are trained to respond quickly in the event of a problem. Various scenarios may require members of the drug team, the Warden, or the CID Director to attend to the inmate quickly, and to speak to each other as they react. The spiritual advisor's location immediately beside the inmate, physical contact with the inmate, and audible prayer would inhibit the team's ability to quickly access the inmate, the IV lines, and to communicate with each other.

16.     Though we cannot safely accommodate physical touch from or audible prayer by the spiritual advisor, the inmate may maintain eye contact with the spiritual advisor during his execution and can gain comfort from the spiritual advisor's presence. The spiritual advisor may pray in silence during the execution. And Mr. Barbee may pray aloud when he makes his final statement.

17.     In addition, Mr. Barbee's chosen spiritual advisor will be able to pray and provide spiritual comfort audibly for up to six hours earlier in the execution day, including during the final hours before the execution.

18.     Our prohibition against the spiritual advisor's physical touch is consistent with the policy for death row inmates during visitation. Death row inmates are not permitted to physically touch their visitors, whether the visitor is family, a friend, or a spiritual advisor. Because death row houses many of TDCJ's most violent, unpredictable, and dangerous inmates, who have nothing to lose by attempting to escape or taking and assaulting a hostage, the rule against physical touch increases the security of the institution and protects visitors and staff.

Pursuant to 27 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2021, in Huntsville, Texas.

_____
Bobby Lumpkin